**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE FRATERNAL ORDER OF POLICE, METROPOLITAN POLICE DEPARTMENT LABOR COMMITTEE, D.C. POLICE UNION, <br><br> Plaintiff, <br><br> v. <br><br> THE DISTRICT OF COLUMBIA, et al., <br><br> Defendants. | Civil Action No.  1:20-cv-02130 |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION FOR SUMMARY JUDGMENT**

The Plaintiff, the Fraternal Order of Police, Metropolitan Police Department Labor Committee, D.C. Police Union ("D.C. Police Union"), by its attorneys, pursuant to FED. R. CIV. P. 56 and LCvR 7(h), hereby submits this Memorandum of Law in Support of its Motion for Summary Judgment.  In support, the D.C. Police Union states the following:

**I.**
**Introduction**

On July, 7 2020, the Council of the District of Columbia passed the Comprehensive Policing and Justice Reform Second Emergency Amendment Act of 2020 (the "Act"), which was signed by Mayor Muriel Bowser on July 22, 2020.  Section 116 of the Act singles out the D.C. Police Union and its members and strips them of the right to bargain with management over discipline.  No other public employees of the District of Columbia or labor unions representing those employees are restricted from bargaining with management concerning discipline.

The D.C. Council's motivation for the Act was clear.  It was not grounded in logic, data, sound policy or reason.  No studies or surveys were conducted, no research was performed or basis was proffered for the passage of the Act other than the protests arising out of an incident that occurred over one thousand miles from the District of Columbia, and that was unrelated to any District resident, agency or officer.  The Act was a deliberate and reactionary concession to anti-police rhetoric and protests being carried out by a small number of citizens, many of whom are not even District residents.   Through the Act, the District has separated sworn law enforcement personnel into a new, distinct class, distinguishing them from all other District employees and has discriminated against that class by stripping them of their right to bargain with management concerning discipline.  The Act violates the United States Constitution's equal protection and substantive due process requirements, is an unconstitutional bill of attainder, violates the Contracts Clause of the Constitution, and violates the District of Columbia Home Rule Act.  As a result, this Court should declare the Act unconstitutional and strike the offensive provision.

## II.
## Background and Summary of Undisputed Facts

On July 7, 2020, the Council of the District of Columbia approved and signed the Comprehensive Policing and Justice Reform Second Emergency Amendment Act of 2020 (the "Act").  *See* **Exhibit 1**; Statement of Undisputed Facts at ¶ 1.  The Chair of the Council of the District of Columbia, Phil Mendelson, transmitted the Act to Mayor Bowser on July 9, 2020.  On July 22, 2020, Mayor Bowser signed the Act.  *See* **Exhibit** 1; Statement of Undisputed Facts at ¶ 2.

The purpose of the Act, as set forth therein, is "[t]o provide, on an emergency basis, for comprehensive policing and justice reform for District residents and visitors, and for other

purposes." *See* **Exhibit 1** at 1; *see also* Statement of Undisputed Facts at ¶ 3.  The Act recites as its basis that, "On May 25, 2020, Minneapolis Police Department officer Derek Chauvin murdered George Floyd by applying a neck restraint to Floyd with his knee for 8 minutes and 46 seconds.  Hundreds of thousands, if not millions, of people in cities and states across the world, including in the District, have taken to the streets to peacefully protest injustice, racism, and police brutality against Black people and other people of color."  *Id*. at 2; Statement of Undisputed Facts at ¶ 3.

Section 116 of the Act amends Section 1708 of the District of Columbia Government Comprehensive Merit Personnel Act ("CMPA"), codified at D.C. Code § 1-617.08, by adding a new subsection (c), which states as follows:

> (c)(1)  All matters pertaining to the discipline of sworn law enforcement personnel shall be retained by management and not be negotiable.
>
> (2)  This subsection shall apply to any collective bargaining agreements entered into with the Fraternal Order of Police/Metropolitan Police Labor Committee after September 30, 2020.

*See* **Exhibit 1** at 12; Statement of Undisputed Facts ¶ 4.  Under its express terms, Section 116 of the Act applies exclusively to "sworn law enforcement personnel" and prohibits the D.C. Police Union from negotiating with management on all matters pertaining to discipline.  *Id.*  No other public employees of the District or labor unions representing those employees are restricted from bargaining with management concerning discipline.  Instead, other employees and unions retain the CMPA right to bargain with management concerning employee discipline to the sole exclusion of the D.C. Police Union and sworn law enforcement.  *See* Statement of Undisputed Facts ¶ 5.

Prior to the enactment of the Act, the D.C. Police Union and every other labor union in the District of Columbia had enjoyed the right to bargain with management concerning the

discipline of their members.  This right was conferred upon District of Columbia government employees through the CMPA.  The CMPA was enacted in 1979, with the purpose to, among other things, "[c]reate uniform systems for personnel administration among the executive departments and agencies reporting directly to the Mayor of the District of Columbia and among the Council, independent agencies, boards, and commissions in the District of Columbia government; . . . [e]stablish impartial and comprehensive administrative or negotiated procedures for resolving employee grievances;" and "[p]rovide for a positive policy of labor-management relations including collective bargaining between the District of Columbia government and its employees."  D.C. Code § 1-601.02.  The stated purpose of the CMPA emphasizes its intention that "[e]mployees are protected against coercion for partisan political purposes."   D.C. Code § 1-601.02(c).  With limited exceptions, the CMPA applies to all agencies and employees of the District of Columbia government.  *See* D.C. Code § 1-602.01; Statement of Undisputed Facts ¶ 6.

Concerning labor relations, the CMPA states: "The District of Columbia government finds and declares that an effective collective bargaining process is in the general public interest and will improve the morale of public employees and the quality of service to the public."  D.C. Code § 1-617.01(a).  As such, the CMPA guarantees that: "Each employee of the District government has the right, freely and without fear of penalty or reprisal, [t]o form, join, and assist a labor organization or to refrain from this activity" and to "engage in collective bargaining concerning terms and conditions of employment, as may be appropriate under this law and rules and regulations, through a duly designated majority representative."  D.C. Code § 1-617.01(b); Statement of Undisputed Facts ¶ 7.

D.C. Code § 1-617.08(b) states that "all matters shall be deemed negotiable except those that are proscribed by this subchapter."  Section 1-617.08(a) states that management shall retain the sole right "[t]o hire, promote, transfer, assign, and retain employees in positions within the agency and to suspend, demote, discharge, or take other disciplinary action against employees for cause."  Notably, while management retained the sole right to take disciplinary action against employees, the process by which agencies administered discipline remained subject to negotiation between management and the labor unions.  *See* Statement of Undisputed Facts ¶ 8.  Accordingly, for the past forty-one (41) years since the passage of the CMPA, every labor union in the District, including the D.C. Police Union, has enjoyed the right to bargain with management concerning the disciplinary process employed by management.  *See* Statement of Undisputed Facts ¶ 9.

Since the passage of the CMPA, the D.C. Police Union and management of the Metropolitan Police Department have negotiated numerous collective bargaining agreements that cover the disciplinary procedures that apply to D.C. Police Union members.  The current Collective Bargaining Agreement ("CBA") between the D.C. Police Union and the Metropolitan Police Department became effective on October 1, 2017, was approved by Mayor Muriel Bowser, and remains effective through September 30, 2020.  *See* CBA, attached as **Exhibit 2**; Statement of Undisputed Facts ¶ 10.

Article 12 of the CBA contains the terms governing the discipline of D.C. Police Union members.  In addition to setting forth the terms governing discipline, Article 12, Section 1 states that the "parties have agreed to form a Joint Labor-Management Committee ("Committee"), with no more than five (5) members per side, to discuss possible revisions to Article 12 (Discipline) of the parties' existing Collective Bargaining Agreement."  *See* **Exhibit 2** at 13; Statement of

Undisputed Facts ¶ 11.  Article 12, Section 2 of the CBA further states that "[t]his current Article 12 . . . shall be incorporated into any successor Collective Bargaining Agreement until such time as the Committee reaches agreement on any revisions to Article 12 or the process described herein is completed."  *See* **Exhibit 2** at 14; Statement of Undisputed Facts ¶ 12.  To date, the Committee has not reached agreement on any revisions to Article 12.  *See* Statement of Undisputed Facts ¶ 12.  Therefore, the current Article 12 "shall be incorporated into any successor Collective Bargaining Agreement" pursuant to the express terms of the CBA.  *See* **Exhibit 2** at 14; Statement of Undisputed Facts ¶ 12.

### III.
### Standard of Review

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  An issue of fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Deference to the nonmoving party has limits, and the "mere scintilla of evidence in support of the [nonmoving party's] position [is] insufficient."  *Id.* at 252.  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

# IV.
# Argument

## A.   The Undisputed Facts Demonstrate that the Act Violates The Constitution's Equal Protection Requirements.

The Act violates the equal protection requirements of the Constitution of the United States because it explicitly denies the right of one group of people – sworn law enforcement and their representatives – to bargain over terms which directly relate and are inextricably linked to their employment.  The Act does not restrict the bargaining rights of any other group of public employees.  The discriminatory distinction drawn in the Act between sworn law enforcement and every other District employee and labor union lacks any rational connection to a legitimate government objective.  Instead, the Act only serves the illegitimate objective of punishing and discriminating against a class of people that are presently disfavored politically.  Accordingly, the Act violates the equal protection requirements of the Constitution of the United States.

The Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  This provision applies to limit actions of the States.  However, the equal protection requirements of the Fourteenth Amendment have been incorporated into the restrictions imposed on Federal action by the Fifth Amendment's Due Process Clause, which applies to the federal government and the District of Columbia.  *See Bolling v. Sharpe*, 347 U.S. 497, 498-99 (1954); *see also Smith v. Dist. of Columbia*, 387 F.Supp.3d 8, 27 (D.D.C. 2019) ("The Fifth Amendment's due process clause forbids the District from denying equal protection of its laws to anyone in the District."); *Creese v. Dist. of Columbia*, 281 F.Supp.3d 46, 52 n.2 (D.D.C. 2017) ("The Equal Protection Clause applies to the District of Columbia via the Fifth Amendment.").

The Constitution's equal protection guarantees require that, where a statutory provision uses classifications to determine those who shall be subject to regulation, "the classification itself must be rationally related to a legitimate government interest" advanced by that provision. *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 533 (1973). This standard, while deferential, is not toothless. "Even in the ordinary equal protection case calling for the most deferential of standards, [courts] insist on knowing the relation between the classification adopted and the object to be attained." *Romer v. Evans*, 517 U.S. 620, 632 (1996). As Supreme Court Justice Robert H. Jackson stated:

> The framers of the Constitution knew, and we should not forget today, that there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally. Conversely, **nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected. Courts can take no better measure to assure that laws will be just than to require that laws be equal in operation**.

*Rwy. Express Agency v. New York*, 336 U.S. 106, 112-13 (1949) (Jackson, J., concurring)(emphasis added).

A provision employing classifications to discriminate in the imposition of statutory burdens may offend equal protection mandates and fail to pass constitutional muster under the rational basis standard in three sets of circumstances. First, the rationale advanced by the government to defend its provision can, itself, be illegitimate. *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 449 (1985). Second, a classification may fail to pass the rational basis test where the government advances a legitimate purpose, but there is no rational basis to conclude that the challenged provision will achieve that purpose. *See Schweiker v. Wilson*, 450 U.S. 221, 235 (1981) (stating that the pertinent inquiry is whether the challenged provision

"advances a reasonable and identifiable governmental objective").  Third, a provision may fail the rational basis test where the distinction between the targeted and non-targeted classes is so disconnected from the proffered purpose and so closely connected to a distinct, illegitimate purpose that one may conclude that the proffered purpose is mere pretext and that the provision's true purpose is illegitimate.  *See, e.g.*, *Craigmiles v. Giles*, 312 F.3d 220, 228 (6th Cir. 2002) ("Finding no rational relationship to any of the articulated purposes of the state, we are left with the more obvious illegitimate purpose to which [the] provision is very well tailored.").

      1.    <u>The Rationale Advanced by the District is Illegitimate</u>

In this matter, the rationale for enacting the Act is, itself, an illegitimate governmental purpose that fails the rational basis test.  *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 449 (1985).  The Act does not reference any findings, data, studies, or research that explains the Council's purpose for stripping the D.C. Police Union and its members of the right to bargain with management over discipline.  Instead, the Act was passed by the Council on an emergency basis without any of the normal rulemaking procedures requiring publication and comment by the public and the stakeholders affected by the Act and was based upon an illegitimate purpose, namely, a negative bias against sworn law enforcement.

The impetus of the Act, by its own terms, was that "Minneapolis Police Department officer Derek Chauvin murdered George Floyd by applying a neck restraint to Floyd with his knee for 8 minutes and 46 seconds.  Hundreds of thousands, if not millions, of people in cities and states across the world, including in the District, have taken to the streets to peacefully protest injustice, racism, and police brutality against Black people and other people of color."  *See* **Exhibit 1** at 2.  Thus, the D.C. Council made clear that its purpose for the Act was based on the conduct of a member of the Minneapolis Police Department, wholly unrelated and

9

unaffiliated with the D.C. Police Union or its members.  The Council then imputed "injustice, racism, and police brutality against Black people and other people of color" on the D.C. Police Union's members, a majority of whom are racial minorities.  *See* Statement of Undisputed Facts at ¶ 13.  The Act does not even attempt to identify sound labor-relations policy to justify stripping the D.C. Police Union and its members of the right to bargain with management over discipline.  Instead, the Act targets and punishes the D.C. Police Union and its members for this unaffiliated and unrelated individual's actions based on unsubstantiated claims of racism and police brutality inexplicably linked to D.C. Police Union members.

In *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 449 (1985), the Supreme Court struck down as unconstitutional a zoning ordinance that required a special use permit for a group home for the mentally handicapped.  The City proffered several justifications for the ordinance and the special use permit including "the negative attitude of the majority of property owners."  *Id*. at 448.  The Supreme Court held that the ordinance violated the Equal Protection Clause, finding:

> It is plain that the electorate as a whole, whether by referendum or otherwise, could not order city action violative of the Equal Protection Clause, **and the City may not avoid the strictures of that Clause by deferring to the wishes or objections of some fraction of the body politic. "Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.**"

*Id*. (quoting *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984)(internal citation omitted)(emphasis added).

In this case, as in *City of Cleburne*, the Act does nothing more than give legal effect to the biases and anti-police rhetoric currently being expressed by citizens.  The law cannot give effect to these private biases and therefore the Court should strike Section 116 as violating the Equal Protection Clause.

Similarly, in *State ex rel. Dayton Fraternal Order of Police Lodge 44 v. State Employment Relations Bd.*, 488 N.E.2d 181 (Ohio 1986), the Supreme Court of Ohio struck down an amendment to the Ohio Public Employees Collective Bargaining Act that excluded certain Dayton police officers from the collective bargaining rights afforded to all other public employees in the state.  The Supreme Court of Ohio held that the amendment violated equal protection guarantees, as follows:

> The purpose of the "Dayton Amendment" is to deny certain Dayton employees the collective bargaining rights enjoyed by all other similarly situated municipal employees in Ohio.  If there is a reason for exempting Dayton employees from the rights enjoyed by all others, then that reason is not contained in the record of this case.
> . . . .
> In sum, the "Dayton Amendment" classification appears to be without any legitimacy and is the very kind of arbitrary legislative enactment that is prohibited by the equal protection guarantees of both the Ohio and United States Constitutions.

*Id.* at 375-76.

In this case, as in *Dayton*, the Act's denial of sworn law enforcement personnel's collective bargaining rights is without any legitimacy and is an arbitrary legislative enactment done as a concession to anti-police rhetoric and protests in the District.  As such, the Act cannot pass the rational basis test and the Court should strike Section 116 as violating the Equal Protection guarantees of the Constitution.

2.     Any Purported Legitimate Purpose Offered by the District is Mere Pretext

Any purported legitimate purpose that the Defendants may cite to support the basis for Section 116 is mere pretext for the actual illegitimate, discriminatory purpose of Section 116.  Where the distinction between targeted and non-targeted classes is so disconnected from the proffered purpose and so closely connected to a distinct, illegitimate purpose, courts may conclude that the proffered purpose is mere pretext and that the provision's true purpose is

11

illegitimate.  *See Craigmiles v. Giles*, 312 F.3d 220, 228 (6th Cir. 2002). The discriminatory distinction drawn in the Act between sworn police personnel and every other District employee and labor union lacks any rational connection to a legitimate government objective.  Instead, the Act only serves the illegitimate objective of punishing and discriminating against a class of people that are presently disfavored politically, *i.e.*, sworn law enforcement.

Courts in other jurisdictions have invalidated laws under the rational basis standard for similar reasons.  For example, in *Truck Drivers & Helpers Local 728 v. City of Atlanta*, 468 F. Supp. 620, 623 (N.D. Ga. 1979), the District Court held that the City of Atlanta violated the Constitution's Equal Protection requirements when it denied payroll deduction of dues to the police union while granting it to the firefighters' union.  The city contended that the disparate treatment of the two departments was "based on differences in the functions which the two departments perform."  *Id*. at 623.  The court determined that the City's proffered basis for the disparate treatment lacked any basis in law or logic, as follows:

> Neither party has cited any authority, and the court has found none, where a classification recognizing the distinction put forward by defendants has been upheld, and in both law and logic it is difficult to understand how such distinction can exist, even assuming it has any relevance to the issue of dues checkoffs.  In fact, the basis for such a distinction is so difficult the court can find none; and the court therefore rules for the plaintiffs: That so long as the City of Atlanta has unions within both its police and fire departments, and so long as it is willing to withhold union dues from the firemen, it must, under the equal protection clause, make the same option open to police employees. That is what equal protection means.

*Id*. at 623-24.

Similarly, in *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002), the State of Tennessee enacted legislation that prohibited the sale of caskets by anyone not licensed to do so without being licensed by the state as a funeral director.  The state set forth several justifications for its enactment of the license requirement, however, the court determined that none of the state's

proffered reasons satisfied rational basis scrutiny. Instead, the court found that the actual purpose of the license requirement was for the illegitimate government purpose of protecting a discrete interest group from economic competition. *See id*. at 224. Accordingly, the court held, "[f]inding no rational relationship to any of the articulated purposes of the state, we are left with the more obvious illegitimate purpose to which [the] provision is very well tailored." *Id*. at 228.

In this case, any legitimate purpose the Defendants could offer to justify Section 116 fails under examination as mere pretext for the obvious illegitimate purpose of Section 116. The Council's intentions and basis for the Act could not have been more clear. The D.C. Council passed the Act as a deliberate and reactionary concession to anti-police rhetoric and protests being carried out by a small number of citizens. In doing so, the Council imputed "injustice, racism, and police brutality against Black people and other people of color" on the D.C. Police Union's members, a majority of whom are racial minorities and used this false narrative to attempt to justify stripping the D.C. Police Union and its members of their collective bargaining rights. The Council further passed the Act on an emergency basis without any of the public notice and participation in rulemaking required for the passage of a law on a non-emergency basis, which would have allowed public debate and would have cautioned against the Act's discriminatory measures. As such, the Act cannot pass the rational basis test and the Court should strike Section 116 as violating the Equal Protection requirements of the Constitution.

   **B.      The Act is an Unconstitutional Bill of Attainder.**

Section 116 of the Act is a constitutionally prohibited bill of attainder because it specifically targets one group – sworn law enforcement – and it imposes punishment on that group by legislative act rather than judicial trial. Through the Act, the D.C. Council has effectively declared that sworn law enforcement officers in the District are guilty of racism and

police brutality, and has stripped away their collective bargaining rights over discipline as punishment.   Accordingly, the Act is an improper and constitutionally impermissible bill of attainder.

Article I, Section 9, Clause 3 of the Constitution of the United States provides that "No Bill of Attainder or ex post facto Law shall be passed."   The prohibition against the passage of bills of attainder applies to the federal government via Article I, Section 9, and the states via Article I, Section 10 ("No State shall . . . pass any Bill of Attainder, [or] ex post facto Law"). The Supreme Court has held that bills of attainder are "legislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial," and are "prohibited by the Constitution."   *United States v. Brown*, 381 U.S. 437, 448-49 (1965).

The U.S. Court of Appeals for the D.C. Circuit has held: "Under the now prevailing case law, a law is prohibited under the Bill of Attainder Clause if it (1) applies with specificity, and (2) imposes punishment."   *Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003) (internal quotations omitted).   "The element of specificity may be satisfied if the statute singles out a person or class by name *or* applies to easily ascertainable members of a group."   *Id.* (citing *United States v. Lovett*, 328 U.S. 303, 315 (1946)) (internal quotations omitted).   As to the punishment element, the Supreme Court has instructed courts to engage in a three-factor inquiry, including:

> (1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, "viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes"; and (3) whether the legislative record "evinces a congressional intent to punish."

*Id.* at 1218 (citing *Selective Serv. Sys. v. Minn. Pub. Interest Research Group*, 468 U.S. 841

(1984)).  Each of these factors is "an independent – though not necessarily decisive – indicator of punitiveness."  *Id.*  As Chief Justice Warren noted on punishment:

> **The deprivation of any rights, civil or political, previously enjoyed, may be punishment, the circumstances attending and the causes of the deprivation determining this fact**.  Disqualification from office may be punishment, as in cases of conviction upon impeachment.  Disqualification from the pursuits of a lawful avocation, or from positions of trust, or from the privilege of appearing in the courts, or acting as an executor, administrator, or guardian, may also, and often has been, imposed as punishment.

*Brown*, 381 U.S. at 448 (emphasis added).

In this case, the first element – specificity – is satisfied because the Act singles out "sworn law enforcement personnel" and their representatives, the D.C. Police Union, by name.  Section 116 of the Act provides as follows:

> (c)(1)  All matters pertaining to the discipline of **sworn law enforcement personnel** shall be retained by management and not be negotiable.

> (2)  This subsection shall apply to any collective bargaining agreements entered into with **the Fraternal Order of Police/Metropolitan Police Department Labor Committee** after September 30, 2020.

(emphasis added).  It is plain that the Act satisfies the specificity requirement for establishing an unlawful bill of attainder.

The second element – whether the Act imposes punishment on "sworn law enforcement personnel" and the D.C. Police Union – is also satisfied because Section 116 of the Act deprives the D.C. Police Union and its members of a right previously enjoyed, namely, the right to collectively bargain with management over discipline.  The D.C. Police Union and its members have enjoyed the right to collectively bargain with management over discipline since the passage of the CMPA in 1979.  Pursuant to this right, the D.C. Police Union and management of the Metropolitan Police Department have negotiated numerous collective bargaining agreements since the passage of the CMPA that cover the disciplinary procedures that apply to D.C. Police

Union members.  Section 116 of the Act singles out the D.C. Police Union and deprives the D.C. Police Union and its members of the right to bargain with management over the discipline of its members while continuing to allow every other public employees of the District or labor unions representing those employees to bargain with management concerning discipline.  The intended purpose is obvious.  The Council perceives that the due process afforded through collective bargaining over discipline will impede officers from being disciplined.  The Council's intent is to deprive the D.C. Police Union of due process so that police officers can be fired summarily and without any procedural safeguards.  As such, Section 116 represents a legislative punishment through the deprivation of the D.C. Police Union's and its members' right to procedural protection from improper discipline.

Section 116 cannot reasonably be found to further a non-punitive legislative purpose and the D.C. Council's intent was to clearly punish the D.C. Police Union and its members.  In the Act, the D.C. Council made clear that it imputed "injustice, racism, and police brutality against Black people and other people of color" on the D.C. Police Union's members.  The Act then uses this false narrative to target and punish the D.C. Police Union and its members for the actions of a member of the Minneapolis Police Department based on erroneous claims of racism and police brutality committed by D.C. Police Union members.  As such, Section 116 of the Act is an impermissible bill of attainder, and this Court should strike the unlawful provisions from the Act.

      **C.**      <u>**The Act Violates the Contracts Clause of the Constitution**</u>.

Section 116 of the Act substantially impairs the contract between the D.C. Police Union and the Metropolitan Police Department, and therefore violates the Contracts Clause of the Constitution of the United States.  Article I, Section 10 of the Constitution of the United States provides that "No State shall . . . pass any . . . Law impairing the Obligation of Contracts."

16

Under the Home Rule Act, D.C. Code § 1-203.02 states that "the legislative power of the District shall extend to all rightful subjects of legislation within the District consistent with the Constitution of the United States and the provisions of this chapter subject to all the restrictions and limitation imposed upon the states by the 10th section of the 1st article of the Constitution of the United States."   The United States Court of Appeals for the District of Columbia has stated that "the District of Columbia is subject to the Contracts Clause."  *Wash. Teachers' Union Local No. 6, Am. Fed. of Teachers, AFL-CIO v. Bd. of Ed. of D.C.*, 109 F.3d 774, 778 (D.C. Cir. 1997).

To determine whether a change in law or regulation violates the Contracts Clause, courts apply the following standard:  (1) Does a contractual relationship exist?; (2) Did a change in law or regulation impair that relationship?; and (3) If a contract has been impaired, was the impairment substantial?  *See Wash. Teachers' Union*, 109 F.3d at 778.  "If these questions lead to the conclusion that a substantial impairment occurred, [courts] then ask whether the change is 'reasonable and necessary to serve an important public purpose.'"  *Id.* (quoting *United States Tr. Co. v. New Jersey*, 431 U.S. 1, 25 (1977).  Moreover, in *United States Tr. Co. v. New Jersey*, 431 U.S. 1, 26 (1977), the Supreme Court stated in a Contracts Clause analysis, "complete deference to a legislative assessment of reasonableness and necessity is not appropriate [when] the State's self-interest is at stake."

The parties' CBA establishes a contractual relationship between the D.C. Police Union and the Metropolitan Police Department, and agency of the District of Columbia.  *See* **Exhibit 2**. The Act has impaired the contract between the D.C. Police Union and the MPD.  Specifically, Article 12 of the parties' CBA contains the terms governing the discipline of D.C. Police Union members.  In addition to setting forth the terms governing discipline, Article 12, Section 1 states that the "parties have agreed to form a Joint Labor-Management Committee ("Committee"), with

17

no more than five (5) members per side, to discuss possible revisions to Article 12 (Discipline) of the parties' existing Collective Bargaining Agreement."  **Exhibit 2** at p. 13.  Notably, Article 12, Section 2 of the CBA states:

> **The current Article 12**, as set forth in the parties' existing Collective Bargaining Agreement, shall remain in full force and effect during the Committee's deliberations and **shall be incorporated into any successor Collective Bargaining Agreement** until such time as the Committee reaches agreement on any revisions to Article 12 or the process described herein is completed.

*Id.* at p. 14 (emphasis added).  To date, the Committee has not reached agreement on any revisions to Article 12.  Therefore, pursuant to the express terms of the CBA, the current Article 12 "shall be incorporated into any successor Collective Bargaining Agreement."  Section 116 of the Act directly and substantially impairs this contractual requirement because it mandates that all matters pertaining to discipline are non-negotiable for any collective bargaining agreement entered into after the present CBA.  Thus, Section 116 renders Article 12, Section 2 of the CBA void.

Section 116 of the Act constitutes a substantial impairment of the contract between the D.C. Police Union and the MPD.  Section 116 permanently forecloses any ability for the D.C. Police Union and its members to bargain with the MPD concerning discipline and serves to remove Article 12 from any future collective bargaining agreements between the parties, despite the clear contractual requirement that the current Article 12 "shall be incorporated into any successor Collective Bargaining Agreement."  The current Article 12 was negotiated by the parties in good faith and contains fourteen separate sections concerning the disciplinary process for D.C. Police Union members.  *See* **Exhibit 2** at p. 14-18.  As such Section 116 upends decades of labor-relations between the D.C. Police Union and the MPD regarding discipline,

thereby substantially impairing the current CBA and all future collective bargaining agreements entered into between the parties.

As described above, the impairment of the contract between the D.C. Police Union and the MPD is not necessary to serve an important public purpose.  Instead, the Act targets and punishes the D.C. Police Union and its members for the actions of a member of the Minneapolis Police Department based on erroneous assumptions of racism and police brutality imputed to D.C. Police Union members.  As such, Section 116 of the Act violates the Contracts Clause of the United States Constitution, and this Court should strike the unlawful provisions from the Act.

### D.    The Act Violates the Plaintiff's Substantive Due Process Rights.

Section 116 of the Act violates the substantive due process rights of the D.C. Police Union and its members to bargain for terms inextricably linked to their employment with the MPD as well as their property right to employment with the MPD.  "Substantive due process 'prevents governmental power from being used for purposes of oppression, or abuse of government power that shocks the conscience, or action that is legally irrational [in that] it is not sufficiently keyed to any legitimate state interests."  *Washington Teachers' Union Local No. 6, Am. Fed'n of Teachers, AFL-CIO v. Bd. of Educ. of the D.C.*, 109 F.3d 774, 781 (D.C. Cir. 1997) (quoting *Comm. of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 943-44 (D.C. Cir. 1988)). The D.C. Circuit has also recognized that a plaintiff may demonstrate a violation of substantive due process by showing a "grave unfairness" to the plaintiff through: "[1] a substantial infringement of state law prompted by personal or group animus, or [2] a deliberate flouting of the law that trammels significant personal or property rights."  *Tri County Indus., Inc. v. District of Columbia*, 104 F.3d 455, 459 (D.C. Cir. 1997).

Section 116 of the Act precludes the D.C. Police Union and its members from exercising their right to bargain for critical terms related to their employment: namely, terms relating to employee discipline.   Notably, D.C. Police Union members have a property interest in their employment with the MPD, which this Court has previously recognized as follows:

> It is undisputed that the Comprehensive Merit Protection Act ("CMPA") creates a property interest for employees governed by it. The CMPA establishes a Career Service for employees in which they are guaranteed to be promoted based on merit and cannot be terminated without cause. D.C.Code §§ 1–608 & 1–616.51. The Career Service includes employees who serve as sworn officers with the MPD. D.C.Code § 1–608.01. Under CMPA, employees can only be disciplined for cause and prior notice must be given. *Id.* Discipline specifically includes reduction in grade or demotions. D.C.Code § 1–616.52(b).

*Fonville v. D.C.*, 448 F. Supp. 2d 21, 26–27 (D.D.C. 2006).  Section 116 of the Act infringes on the property interests that all D.C. Police Union members have in their employment by removing collectively-bargained for safeguards that ensure that they will only be disciplined for cause.  By singling out the D.C. Police Union and its members as the only government employees who cannot collectively bargain for these due process safeguards to protect their property interest in their employment, the Defendants have violated the due process rights of the D.C. Police Union and its members.

Furthermore, Section 116 of the Act imposes a "grave unfairness" on the D.C. Police Union and its members by completely removing their right to collectively bargain over discipline based entirely on animus for sworn law enforcement officers.  This animus is clear in the Act in which the Council imputes "injustice, racism, and police brutality against Black people and other people of color" to the D.C. Police Union's members, a majority of whom are racial minorities. This animus is further exposed by the decision of the Council to separate sworn law enforcement personnel into a new, distinct class, separating them from every other District government employee for the sole purpose of discriminating against a disfavored class and stripping them of

their rights.  Accordingly, Section 116 of the Act constitutes the kind of grave unfairness and substantial infringement on the rights of the D.C. Police Union and its member that violates the substantive protections of the Constitution's Due Process Clause.  As such, this Court should strike the unlawful provisions from the Act.

### E.      The Defendants' Constitutional Violations also Constitute Violations of the D.C. Home Rule Act

The District of Columbia Home Rule Act, D.C. Code § 1-203.02 states that "the legislative power of the District shall extend to all rightful subjects of legislation within the District consistent with the Constitution of the United States and the provisions of this chapter subject to all the restrictions and limitation imposed upon the states by the 10th section of the 1st article of the Constitution of the United States."  Accordingly, by its plain terms, the D.C. Home Rule Act explicitly states that the actions of the District, the Mayor, and the Council are all restricted by the requirements of the Constitution of the United States.  An act of the District, the Mayor, or the Council which violates the restrictions and requirements of the Constitution of the United States also violates the D.C. Home Rule Act.  Therefore, the constitutional violations described above, also constitute violations of the D.C. Home Rule Act.

### F.      The D.C. Police Union is Entitled to Attorneys' Fees under 42 U.S.C. § 1988

This action arises under 42 U.S.C. § 1983, which provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  Under 42 U.S.C. § 1988, "[i]n any action to enforce [Section 1983], the court, in its discretion, may allow the prevailing party, other

than the United States, a reasonable attorney's fee as part of the costs."  The violations and deprivations of constitutional rights demonstrated above, are sufficient to pursue vindication of those rights and redress under Section 1983.  Accordingly, the Court should grant summary judgment in favor of the D.C. Police Union and further grant the D.C. Police Union its reasonable attorneys' fees and costs incurred in pursuing this action.

## V.
## <u>Conclusion</u>

Section 116, the Act suffers from several fatal Constitutional defects that warrant this Court granting summary judgment.  Based upon the undisputed material facts, the Act violates the equal protection and due process requirements of the Fifth Amendment and Fourteenth Amendments to the United States Constitution, Article I, Section 9, Clause 3 of the United States Constitution prohibiting bills of attainder, the Contracts Clause contained in Article I, Section 10, Clause 1 of the United States Constitution, and the District of Columbia Home Rule Act.  As a result, the D.C. Police Union is entitled to judgment as a matter of law, and this Court should grant summary judgment in favor of the D.C. Police Union ruling Section 116 of the Act unconstitutional.

Respectfully submitted,

____*/s/ Anthony M. Conti*_____
Anthony M. Conti (D.C. Bar No. 479152)
Daniel J. McCartin (D.C. Bar No. 976580)
CONTI FENN LLC
36 South Charles Street, Suite 2501
Baltimore, Maryland  21201
(410) 837-6999
(410) 510-1647 (facsimile)

Attorneys for Plaintiff