## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRATERNAL ORDER OF POLICE, METROPOLITAN POLICE DEPARTMENT LABOR COMMITTEE, D.C. POLICE UNION,<br><br>　　　　Plaintiff,<br><br>v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>　　　　Defendants. | Civil Action No. 20-02130 (JEB) |

### DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION TO DISMISS PLAINTIFF'S COMPLAINT OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendants the District of Columbia and Mayor Muriel Bowser (collectively, the District), oppose plaintiff's motion for summary judgment and cross-move to dismiss plaintiff's Complaint or, in the alternative, for summary judgment. Fed. R. Civ. P. 12(b)(6), 56(a).

As set forth in the accompanying memorandum of points and authorities, plaintiff is not entitled to summary judgment, and dismissal is appropriate, because plaintiff has failed to state a violation of the Equal Protection Clause, Bill of Attainder Clause, Due Process Clause, Contracts Clause or the D.C. Home Rule Act. The Complaint specifically challenges Section 116 of the District's Comprehensive Policing and Justice Reform Second Emergency Amendment Act of 2020 (the Act)—making all matters pertaining to the discipline of sworn law enforcement personnel

non-negotiable and retained by management—but plaintiff fails to allege facts sufficient to establish that the Act violates any constitutional provision and cannot succeed on the merits of its claims. Plaintiff's motion for summary judgment should be denied, and the District's cross-motion to dismiss or, in the alternative, for summary judgment should be granted. A proposed order is attached.

Dated:  September 4, 2020.          Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Chief, Equity Section

*/s/ Pamela A. Disney*
PAMELA A. DISNEY [1601225]
GAVIN N. PALMER [1619264]
Assistant Attorneys General
400 Sixth Street, N.W., Suite 10100
Washington, D.C.  20001
(202) 807-0371
pamela.disney@dc.gov

*Counsel for Defendants*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRATERNAL ORDER OF POLICE, METROPOLITAN POLICE DEPARTMENT LABOR COMMITTEE, D.C. POLICE UNION,<br><br>    Plaintiff,<br><br>v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>    Defendants. | Civil Action No. 20-02130 (JEB) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION TO DISMISS PLAINTIFF'S COMPLAINT OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

## INTRODUCTION

Plaintiff, the Fraternal Order of Police, Metropolitan Police Department Labor Committee, D.C. Police Union, brings this lawsuit against the District of Columbia and Mayor Muriel Bowser (collectively, the District), challenging the recently enacted Comprehensive Policing and Justice Reform Second Emergency Amendment Act of 2020, D.C. Act 23-336, 67 D.C. Reg. 9148 (July 31, 2020) (the Act). The Act seeks to address issues in the District related to systemic racism, police brutality and misconduct, and police accountability. Plaintiff specifically takes issue with a provision of the Act that makes the discipline of sworn law enforcement personnel non-negotiable and retained by management, which applies to any collective bargaining agreements (CBAs) entered into with the plaintiff after September 30,

2020. Plaintiff alleges that the provision violates the Equal Protection Clause of the Fifth and Fourteenth Amendments; the prohibition of bills of attainder contained in Article 1, Section 9, Clause 3 of the Constitution; the Contracts Clause contained in Article 1, Section 10, Clause 1 of the Constitution; the Due Process Clause of the Fifth and Fourteenth Amendments; and the District of Columbia's Home Rule Act.

But plaintiff fails to establish any violation. First, plaintiff alleges that the Act violates the Equal Protection Clause, but plaintiff cannot succeed on the claim because it fails to allege that the Act treats sworn officers differently than other similarly situated public employees and ignores the legitimate rationale for the passage of the Act. Second, plaintiff fails to establish a bill of attainder claim because plaintiff cannot show that the Act constitutes legislative punishment. Third, plaintiff's Contract Clause claim cannot succeed because the Act applies to future CBAs—not to an existing contract—and, regardless, any impairment of an existing contract is reasonable and necessary to improve police accountability. Fourth, plaintiff fails to establish a violation of the Due Process Clause because the Act does not deprive plaintiff of a valid life, liberty, or property interest and—even if it did— the Act is rationally related to a legitimate government purpose. Finally, plaintiff's claim under the Home Rule Act cannot succeed because plaintiff fails to establish any constitutional violation.

Plaintiff's claims not only fail to state a claim for which relief can be granted, the claims also fail as a matter of law. The material facts in this case are not in dispute, and plaintiff fails to allege any basis or provide any evidence on which to

prevail on the merits. As a result, the Court should deny plaintiff's motion for summary judgment and grant the District's motion to dismiss or, in the alternative, for summary judgment.

## BACKGROUND

### I.    The Comprehensive Merit Personnel Act

In 1979, the Council of the District of Columbia (the Council) passed the Comprehensive Merit Personnel Act (CMPA) to provide the District with a "modern flexible system of public personnel administration." D.C. Code § 1-601.02. Among other things, the CMPA provides employees with specific statutory rights and procedural guarantees regarding disciplinary grievances and the ability to appeal adverse decisions. *Id.* §§ 1-616.51-54. And it provides that employees of the District government shall have the right to "engage in collective bargaining concerning terms and conditions of employment, *as may be appropriate under this law* and rules and regulations, through a duly designated majority representative." *Id.* § 1-617.01(b) (emphasis added).

Under the CMPA, management "retain[s] the sole right" to "hire, promote, transfer, assign, and retain employees in positions with the agency and to suspend, demote, discharge, or take other disciplinary action against employees for cause." *Id.* § 1-617.08. This right is not negotiable and cannot be waived. *Id.*

In addition to retaining management's right to discipline, promote and retain employees, *see id.*, the CMPA identifies additional limitations in a specific group's ability to bargain over the processes involved in those decisions. For instance, the

3

CMPA limits the bargaining power of government attorneys by making "the Mayor's and the Attorney General's decisions regarding disciplinary actions … final." D.C. Code § 1-608.56. This restriction prevents unions representing attorneys from bargaining for attorneys' ability to arbitrate after an adverse action, a right currently enjoyed by plaintiff. *See* Pl.'s Mot. for Summ. J. (Pl.'s MSJ), Ex. 2 (CBA) [3-5] at 15 ("Upon receipt of the decision of the Chief of Police on Adverse Actions, the employee may appeal to arbitration … ."). Similarly, the CMPA specifically restricts the bargaining power of unions representing public school employees by making "the evaluation process and instruments for evaluating District of Columbia Public Schools employees … a non-negotiable item for collective bargaining purposes." D.C. Code § 1-617.18.

Moreover, the CMPA is replete with provisions that are tailored to specific District employees based on the agencies for which they work and the unique issues associated with their positions. Several of these provisions are tailored to police officers. For example, District police officers maintain a separate retirement system, *see id.* § 1-626.02, are subject to separate rules and regulations concerning their personnel systems, *see id.* § 1-608.01, and may be appointed laterally from other police departments without following requirements that apply to other newly hired employees, *see id.* § 1-610.71-76.

Regulations implementing the CMPA also provide special treatment to sworn members of the Metropolitan Police Department (MPD). For example, regulations

regarding corrective adverse actions, enforced leave, and grievances specifically exempt police officers. 6 DCMR § 1600.

Though not contained within the CMPA, other provisions of the D.C. Code operate in tandem with the CMPA to provide tailored treatment to police officers on matters regarding discipline. For example, police officers, along with firefighters, have the unique benefit of a 90-day rule limiting the time in which disciplinary action can be brought against them. D.C. Code § 5-1031. Police officers also have unique access to trial boards that handle disciplinary matters and make determinations. D.C. Code § 5-133.06.

## II.      The D.C. Police Union's CBA with the District.

The D.C. Police Union's current CBA with the District is effective from October 1, 2017 through September 30, 2020. *See* Pl.'s Ex. 2 [3-5] at 2. Article 12, Section 1 of the CBA provides that employee discipline matters will be resolved by a joint labor-management committee (Committee). *Id.* at 14. Article 12, Section 2 adds that the disciplinary procedures included "shall remain in full force and effect" while the Committee is considering any changes to the disciplinary process, and that the existing procedures would be "incorporated into any successor CBA" while the Committee is deliberating. *Id.* at 15. And Article 12, Section 3 states that the Committee "shall have six (6) months to complete its negotiations." *Id.*

## III.     The Comprehensive Policing and Justice Reform Second Emergency Amendment Act of 2020

On July 6, 2020, the Act was introduced in the Council. *See* https://lims.dccouncil.us/Legislation/B23-0825 (last accessed Sept. 1, 2020). Section

116 of the Act (Section 116) amends the CMPA by adding the following subsection to D.C. Code § 1-617.08:

> (c)(1) All matters pertaining to the discipline of sworn law enforcement personnel shall be retained by management and not be negotiable.
> (2) This subsection shall apply to any collective bargaining agreements entered into with the Fraternal Order of Police/Metropolitan Police Department Labor Committee after September 30, 2020.

By providing that Section 116 shall only apply prospectively to CBAs entered after September 30, 2020, the Council ensured that the provision would not go into effect until the D.C. Police Union's current CBA with the District had expired.

The Council passed the Act unanimously at its legislative meeting on July 7, 2020. *Id.* Mayor Bowser signed it into law and enacted it with Act Number A23-0336 on July 22, 2020. *Id.* The Act was published in the D.C. Register on July 31, 2020. 67 D.C. Reg. 9148.

The Act's legislative history sheds light on the Council's purpose and motivations underlying the legislation. Prior to the passage of the Act, the Council passed the first version of the bill—the Comprehensive Policing and Justice Reform Emergency Amendment Act of 2020—on June 9, 2020. *See* https://lims.dccouncil.us/Legislation/B23-0774 (last accessed Sept. 1, 2020).[1] That bill's accompanying emergency declaration resolution contained the purpose of the

---

[1]      The first emergency bill contained many of the provisions ultimately passed in the Act, including the text of Section 116. *Id.* The first emergency bill never became law. *Id.* On July 7, 2020, after passing the Act, the Council voted to reconsider and table the first emergency bill, so that the Act could be implemented in its stead. *See Thirty-Second Legislative Meeting* (July 7, 2020) (3:22:42)*, available at* http://dc.granicus.com/MediaPlayer.php?view_id=3&clip_id=5571.

6

bill: "To declare the existence of an emergency with respect to the need to provide for comprehensive policing and justice reform for District residents and visitors." Comprehensive Policing and Justice Reform Emergency Declaration Resolution of 2020 (Emergency Declaration Resolution), PR23-0826, § 2(j) (June 9, 2020). In support of the bill, the emergency declaration resolution cites the thousands of people in cities across the country, including the District, that "have given voice to the deep anger and trauma engendered by acts of violence by the police against Black Americans and have energized a national movement around racism in policing, the use of force, lack of police accountability and transparency, and systemic racial injustice and inequity." *Id.* The Council recounts the deaths of Black Americans around the country and in the District as evidence of the "enduring systems of institutional racism" and, specifically, the "troubling relationship" many District residents have with law enforcement. *Id.* In response to the District residents who are "standing up for racial justice and demanding change," the Council passed the bill to "enhance police accountability and transparency through the implementation of numerous reforms and best practices." *Id.* In the second emergency declaration resolution that accompanied the Act, the Council expressly adopted the intent stated in support of the first emergency declaration. Comprehensive Policing and Justice Reform Second Emergency Declaration Resolution of 2020 (Second Emergency Declaration Resolution), PR 23-0872, § 2(b) (July 7, 2020).

The legislative history also reveals the intent behind Section 116. Council Chairman Phil Mendelson offered the text that ultimately became Section 116,

making all matters pertaining to the discipline of sworn law enforcement non-negotiable, as an amendment to the first emergency bill, passed on June 9, 2020. B23-0774 Amendment at 2, *available at* https://lims.dccouncil.us/downloads/LIMS/45107/Meeting1/Amendment/B23-0774-Amendment1.pdf. Chairman Mendelson's proposed amendment contained a statement of the rationale:

> Collective bargaining agreements are an essential tool for workers to negotiate and receive fair compensation, benefits, and workplace accommodations, *but they should not be used to shield employees from accountability*, particularly those employees who have as much power as police officers. This subtitle ensures that future collective bargaining agreements between the Fraternal Order of Police/Metropolitan Police Department Labor Committee and the District of Columbia does not restrict management's right to discipline sworn officers.

*Id.* (emphasis added).

III. **Plaintiff's Allegations**

Plaintiff filed its Complaint on August 5, 2020, alleging that the Act deprived plaintiff of its rights under the Equal Protection Clause of the Fifth and Fourteenth Amendments; the Due Process Clause of the Fifth and Fourteenth Amendments; the prohibition of bills of attainder contained in Article 1, Section 9, Clause 3 of the Constitution; the Contracts Clause contained in Article 1, Section 10, Clause 1 of the Constitution; and the District of Columbia's Home Rule Act, D.C. Code § 1-203.02. Compl. at 1. Specifically, plaintiff objects to Section 116 of the Act, which amends the CMPA by requiring "all matters pertaining to discipline of sworn law enforcement personnel [to] be retained by management and not be negotiable." *Id.* ¶ 9 (quoting the Act). Plaintiff seeks declaratory and injunctive relief "permanently enjoining the approval, enactment and enforcement of Section 116 of the Act," as well as attorney's

fees and costs. *Id.* at 10, 11, 12, 14, 16. On August 14, 2020, plaintiff served the District and contemporaneously moved for summary judgment [3], seeking judgment on all claims.

## LEGAL STANDARDS

### I.   <u>Motion to Dismiss</u>

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557).

In evaluating a motion under Rule 12(b)(6), the Court "may consider … the facts alleged in the complaint, any documents either attached to or incorporated in the complaint, and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *see Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*, 909 F.3d 446, 464–65 (D.C. Cir. 2018) (finding that at the motion to dismiss stage, the court may take judicial notice

of the congressional hearings and legislative materials to provide evidence of statutory purpose).

## II.   <u>Motion for Summary Judgment</u>

Under Fed. R. Civ. P. 56(a), a court should "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A party may move "for summary judgment at any time," including at the beginning of a case before discovery has commenced. Fed. R. Civ. P. 56(b); *see also Parker v. Hoglander*, Civil Action No. 15-00926, 2016 WL 3527014, at *3-4 (D.D.C. June 23, 2016). The movant has the initial burden of demonstrating the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden is met, the nonmovant must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). Although the court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in its favor, the "mere existence of a scintilla of evidence in support of" the nonmovant is "insufficient" to stave off summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The nonmovant must adduce "evidence on which the jury could reasonably find for" it at trial. *Id.*

## ARGUMENT

I.   **Plaintiff Cannot Establish a Violation of the Equal Protection Clause Because It Has Not Alleged that the Act Treats the Police Union Differently than Other Public-Sector Unions that Are Similarly Situated, and the Law Has a Rational Basis.**

Plaintiff claims that Section 116 of the Act violates the Equal Protection Clause because it denies the D.C. Police Union the right to bargain over the discipline process for employees and does not apply to any other public-sector unions. Compl. ¶ 21; Pl.'s MSJ at 7. But plaintiff's equal protection claim fails because it has not plausibly alleged "that the government intentionally treated [D.C. Police Union members] differently from others who were similarly situated." *BEG Invs., LLC v. Alberti*, 85 F. Supp. 3d 13, 34 (D.D.C. 2015); *see United States v. Bell*, 506 F.2d 207, 221-22 (D.C. Cir. 1974) ("That different persons receive different treatment at the hand of Government does not, without more, demonstrate constitutional inequality."). Moreover, even if plaintiff had showed that D.C. Police Union members are treated differently than others who are similarly situated, there is a rational basis for the alleged differential treatment.

### A.   **Plaintiff Is Not Similarly Situated to Other Unions in Matters Concerning Discipline.**

Plaintiff does not allege any facts that, if true, would show that it is similarly situated to other public-sector unions in the District to which the Act does not apply. Though plaintiff notes that it is being treated differently than other public employee unions, plaintiff does not even allege that it is similarly situated to those other unions. *See* Compl. ¶ 10; Pl.'s MSJ at 7. Such an omission is fatal to their equal

protection clause claim. *See BEG Invs., LLC*, 85 F. Supp. 3d at 33 (finding plaintiff failed to state an Equal Protection Clause claims where the complaint failed to provide any factual allegations suggesting other businesses were similarly situated); *Mpras v. District of Columbia*, 74 F.Supp.3d 265, 271 (D.D.C.2014) (finding plaintiff's conclusory allegations of being treated differently from those "similarly situated" were insufficient to state an equal protection clause claim because the complaint did not allege any supporting facts "about who these other persons are or how they were similarly situated").

Even if plaintiff's assertions of differential treatment were construed as a statement of being similarly situated to other unions, such "unsupported and conclusory allegations are not enough" to make out an equal protection claim "in the absence of actual evidence of disparate treatment." *Texas Border Coal. v. Napolitano*, 614 F. Supp. 2d 54, 65-66 (D.D.C. 2009) (citing *Bois v. Marsh*, 801 F.2d 462, 466 n.5 (D.C. Cir. 1986) (noting in equal protection context that "vague allegations, especially when unsupported by an affidavit or other evidence … are insufficient to state a claim")). It is well established that equal protection "does not require all persons everywhere be treated alike … [but rather] that the government not treat similarly situated individuals differently without a rational basis." *Noble v. U.S. Parole Comm'n*, 194 F.3d 152, 154 (D.C. Cir. 1999) (emphasis in original) (citing *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)). Under this standard, plaintiff fails to allege a viable equal protection challenge.

Indeed, plaintiff cannot plausibly claim that it is similar to other unions regarding matters of discipline. As Chairman Mendelson stated in the rationale for Section 116, the risk of collective bargaining agreements being used to "shield employees from accountability" is especially concerning for "employees who have as much power as police officers." B23-0774 Amendment at 2. Law enforcement officers are uniquely responsible for public safety and given extraordinary powers to do their job, including the ability to use lethal force when appropriate. And although plaintiff contends that police officers are the only group for whom the Council has limited bargaining ability over discipline, the CMPA also imposes limits on the extent to which government attorneys can bargain over discipline. D.C. Code § 1-608.56. Like police officers, government attorneys have a special duty to others, and restricting bargaining over their discipline is a sensible policy decision. Because police officers wield great power in the course of their duties, the consequences for officers' failure to comply with appropriate procedures and policies are significant, and they are not similarly situated to other District employees in the context of discipline. Indeed, District laws and regulations already recognize this and provide police officers disciplinary protections that other District employees do not receive, such as a 90-day rule limiting the time in which disciplinary action can be brought against them, *see* D.C. Code § 5-1031, exempting them from regulations affecting disciplinary matters for other District employees, *see* 6 DCMR § 1600, and providing trial boards for disciplinary determinations, *see* D.C. Code § 5-133.06.

13

**B.** **The Act Is Rationally Related to the Legitimate Goal of Improving Police Accountability.**

"The Equal Protection Clause provides a basis for challenging legislative classifications that treat one group of persons as inferior or superior to others, and for contending that general rules are being applied in an arbitrary or discriminatory way." *Metro. Wash. Ch., Assoc. Builders & Contractors, Inc. v. District of Columbia*, 57 F. Supp. 3d 1, 28 (D.D.C. 2014) (quotations and citation omitted). When a challenged classification impinges on a fundamental right or targets a suspect class, it is subject to strict scrutiny. *Id.* The particular right asserted here—the right to bargain over matters concerning employee discipline—has not been determined to be fundamental, in a constitutional sense, by the Supreme Court or the D.C. Circuit. And plaintiff does not allege that police officers are a suspect class. *See generally* Compl. Consequently, to the extent there is any difference in treatment, the classification need only bear a "rational relation to some legitimate end." *Romer v. United States*, 517 U.S. 620, 631 (1996); *see also Hettinga v. United States*, 677 F.3d 471, 478 (D.C. Cir. 2012) ("A statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.") (internal quotation marks and citations omitted). Plaintiff does not appear to dispute that the rational basis test applies here. *See* Pl.'s MSJ at 8-9.

"Even at the motion to dismiss stage, a plaintiff alleging an equal protection violation must plead facts that establish that there is not 'any reasonable conceivable

state of facts that could provide a rational basis for the classification.'" *Hettinga*, 677 F.3d at 479 (quoting *Dumaguin v. Sec'y of Health & Human Servs.*, 28 F.3d 1218, 1222 (D.C. Cir. 1994)). "Rational basis review is thus 'highly deferential,' and it 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" *Metro. Wash. Ch.*, 57 F. Supp. 3d at 28 (internal citations omitted). "Where no suspect classification is involved, the government is 'entitled to a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality.'" *Frazier v. D.C. Dep't of Emp't Servs.*, 229 A.3d 131, 141 (D.C. 2020) (internal quotation marks and citation omitted). Plaintiff here simply cannot overcome this presumption of rationality because it is conceivably rational that prohibiting bargaining over the disciplinary processes for D.C. Police Union members would lead to more accountability for sworn law enforcement officials.

Plaintiff suggests that the Act's lack of reference to "any findings, data, studies, or research that explains the Council's purpose" for including Section 116 is evidence of lack of rational basis, but plaintiff is wrong. Pl.'s MSJ at 9. Indeed, "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (emphasis added). Similarly, "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Heller v. Doe by Doe*, 509 U.S. 312, 321 (1993). Even a law that in many instances "may exact a needless, wasteful

requirement" can satisfy rational basis review. *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487 (1955).[2]

Given how "highly deferential" the standard is, *Dixon v. District of Columbia*, 666 F.3d 1337, 1342 (D.C. Cir. 2011), "it should come as no surprise that the [Supreme] Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny," *Trump v. Hawaii*, 138 S. Ct. 2392, 2420 (2018). "On the few occasions where [it has] done so, a common thread has been that the laws at issue lack any purpose other than a bare desire to harm a politically unpopular group." *Id.* (alterations and internal quotation marks omitted). Such a finding is not plausible here.

Given that police misconduct and accountability remain a significant public concern, it is certainly rational for the District to remove law enforcement officers' ability to bargain over disciplinary procedures. The goal of the Act is eminently reasonable: to "enhance the police accountability and transparency through the

---

[2]     Although unnecessary to uphold the Act, the Court may take judicial notice of the many articles and studies that support the need for the type of reform that plaintiff is challenging here. Fed. R. Evid. 201(b); *see, e.g.*, Brian Mogck, Post, *A Proposal for Police Reform*, U. Chi. L. Rev. Online (2020) ("[T]here is reason to fear that some well-meaning legislative reforms will ultimately be frustrated unless the rules governing police accountability and discipline found in police contracts are overhauled."), *available at* https://lawreviewblog.uchicago.edu/2020/08/07/police-unions-mogck; U.S. Commission on Civil Rights, *Police Use of Force: An Examination of Modern Policing Practices* 58 (Nov. 15, 2018) ("Police union contract provisions can pose another challenge deterring law enforcement officials from holding their officers accountable."); Stephen Rushin, *Police Union Contracts*, 66 Duke L.J. 1191, 1198 (2017) (analyzing 178 police union collective bargaining agreements and finding that "a substantial number of these contracts unreasonably interfere with or otherwise limit the effectiveness of mechanisms designed to hold police officers accountable for their actions").

implementation of numerous reforms and best practices." Second Emergency Declaration Resolution, PR 23-0872, § 2(b). The Council provided specific reasons for implementing the changes in the District now, including many District residents' "troubling relationship" with law enforcement and the death of Black Americans following interactions with the police. *Id.* Section 116 is rationally connected to addressing these issues. Police officers are accountable to the public and must instill a sense of security in communities. The manner in which MPD handles discipline is just one means of holding officers accountable to the public and, as deemed by the Council, it is entirely appropriate that discipline is non-negotiable for accountability purposes. By ensuring that management's right to discipline sworn officers is unencumbered by the CBA negotiations, the District can improve police accountability. *See* B23-0774 Amendment.

The cases plaintiff cites where courts purportedly struck down statutes under the rational basis test are not applicable here. Plaintiff relies heavily on *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 449 (1985), but that case involved a quasi-suspect class and a standard of review that is higher than rational basis. Plaintiff also cites several out-of-circuit cases in which a court struck down statutes for lack of rational basis, but—unlike the Act—those cases included statutes that lacked any articulation of a legitimate government interest.

In *State ex rel. Dayton Fraternal Order of Police Lodge 44 v. State Employment Relations Bd.*, 488 N.E.2d 181 (Ohio 1986), the Ohio Supreme Court struck down a law that granted collective bargaining rights to other public employees

but did not grant any collective bargaining rights to police officers. But there is an important difference between exempting police officers from bargaining over one procedural aspect of an issue that is inherently management's right—employee discipline—and failing to give police officers *any* collective bargaining rights. And there, unlike in this case, the court found that there was no reason contained in the record for the exemption, *id.* at 186, whereas here, the legislative history indicated that the exemption to the disciplinary process was intended to improve police accountability, given the uniquely great power entrusted to police officers, *see* B23-0774 Amendment.

Plaintiff's reliance on *Truck Drivers & Helpers Local 728 v. City of Atlanta*, 468 F. Supp. 620, 623 (N.D. Ga. 1979), is similarly misplaced. There, the U.S. District Court for the Northern District of Georgia found that the City of Atlanta's policy of providing a union dues checkoff for firefighters but not police officers lacked a rational basis, because the policy of discouraging union membership for employees who play a crucial role in promoting public safety applied equally to firefighters as well as police officers. *Id.* at 623. Here, on the other hand, there is a rational basis for any differential treatment—there is no evidence that firefighter misconduct and accountability is a significant public problem, unlike the issue of police misconduct and accountability. And of course, police officers have the power to enforce the law and use force against citizens—powers that firefighters do not. Moreover, even if firefighters experience similar misconduct and accountability issues, it would still not give rise to an equal protection claim because the "Equal Protection Clause does not

require that a State must choose between attacking every aspect of a problem or not attacking the problem at all." *Dandridge v. Williams*, 397 U.S. 471, 486-487.

Although the legislative record is clear, plaintiff incorrectly identifies the rationale underlying the Act and fails to show that the Act lacks a rational basis. Plaintiff alleges that the Council "made clear that its purpose for the Act was based on the conduct of a member of the Minneapolis Police Department, wholly unrelated and unaffiliated with the D.C. Police Union or its members." Pl.'s MSJ at 9. But to support this contention, plaintiff cites a reference to George Floyd's murder, which does not appear in Section 116 and instead is mentioned in a provision of the Act specifically addressing neck restraints. *See* Subtitle A of the Act. In fact, as noted above, the stated rationale for the Act cites the concerns of District residents, the troubling relationship some residents have with District police officers, and the deaths of Black men in the District. *See* Second Emergency Declaration Resolution, PR 23-0372, § 2(b). There is no question that police reform is an important nationwide issue, and there is no reason that the Council must wait for a particular new tragedy to occur here in order to legislate in the interests of its constituents.

Plaintiff also inaccurately accuses the Council of "not even attempt[ing] to identify sound labor-relations policy" and "[passing] the Act as a deliberate and reactionary concession to anti-police rhetoric and protests." Pl.'s MSJ at 10, 13. These allegations blatantly ignore the substantial legislative history discussing the broader aims of the Act and incorrectly place the burden on the District to provide a rational basis for the Act, when it is plaintiff who bears the burden of showing why the Act is

*not* rational. *See Frazier*, 229 A.3d at 141 (plaintiff must "make a clear showing of arbitrariness and irrationality, and must negat[e] every conceivable basis which might support it") (citation omitted). Even if the District had failed to articulate any rationale for the Act, the absence of an articulated basis for its passage would not doom the rational basis analysis. *Id.* ("a legislature or govern[ment] decisionmaker [need not] actually articulate at any time the purpose or rationale supporting its classification") (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 15 (1992)). Plaintiff has failed to meet its burden here and, as a result, has failed to state a claim under the Equal Protection Clause.

## II.   <u>The Act Is Not a Bill of Attainder Because It Does Not Impose a Punishment.</u>

Plaintiff claims that Section 116 is a bill of attainder because it specifically targets one group and "imposes punishment on that group by legislative act rather than judicial trial." Pl.'s MSJ at 13; *see* Compl. ¶¶ 26-30. But plaintiff is incorrect. Plaintiff cites as evidence the lack of "studies or surveys conducted" or "research performed" and the inaccurate statement that the only proffered reason for the Act was the "protests arising out of an incident that occurred over one thousand miles from the District." Compl. ¶¶ 27, 30. Plaintiff's misguided allegations are insufficient to state a claim that the Act violates the Bill of Attainder Clause of the Constitution.

The Constitution provides that "[n]o Bill of Attainder … shall be passed." U.S. Const. art. I, § 9, cl. 3. "This provision prohibits Congress from enacting 'a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial.'" *Foretich v. United States*, 351

F.3d 1198, 1216 (D.C. Cir. 2003) (quoting *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977)). A statute constitutes is a bill of attainder "if it (1) applies with specificity, and (2) imposes punishment." *BellSouth Corp. v. FCC*, 162 F.3d 678, 683 (D.C. Cir. 1998).

That the Act satisfies the specificity prong of the *Nixon* test does not suggest it is a bill of attainder. "[S]pecificity is shown if the law applies to 'easily ascertainable members of a group.'" *BellSouth Corp.*, 144 F.3d at 62–63 (quoting *Lovett*, 328 U.S. at 315)). Plaintiff emphasizes that its members were named in the Act while members of other unions were not, Compl. ¶ 29. Pl.'s MSJ at 13-15; however, legislating with such particularity is neither remarkable nor persuasive. Importantly, the Bill of Attainder Clause was "not intended to serve as a variant of the equal protection doctrine, invalidating every Act … that legislatively burdens some persons or groups but not all other plausible individuals." *Nixon*, 433 U.S. at 471. To find otherwise would limit a legislature "to the choice of legislating for the universe, or legislating only benefits, or not legislating at all." *Id.* And "[s]ince virtually all legislation operates by identifying the characteristics of the class to be benefited or burdened, it is not clear that the specificity requirement retains any real bite." *BellSouth Corp.*, 144 F.3d at 62-63. Here, the challenged provision might satisfy the specificity prong by applying to "all sworn officers," but this is not dispositive for plaintiff's claim because they must also satisfy the second prong.

Plaintiff cannot satisfy the second prong to establish that the Act inflicts "punishment." In *Nixon,* the Supreme Court identified three inquiries to determine

whether a statute punishes a specific person or group:  "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, viewed in terms of the type and severity of the burdens imposed, reasonably can be said to further non-punitive legislative purposes; and (3) whether the legislative record evinces a congressional intent to punish." *Navegar, Inc. v. United States*, 192 F.3d 1050, 1065-66 (D.C. Cir. 1999). All three of these inquiries weigh in favor of upholding the Act.

### A.   <u>The Act Does Not Fall Within the Historical Meaning of Legislative Punishment.</u>

The historical inquiry indicates that the Act does not resemble legislative punishment. Historically, bills of attainder refer to a legislature's imposition of "deprivations and disabilities so disproportionately severe and so inappropriate to nonpunitive ends that they unquestionably have been held to fall within the proscription of Art. I, s 9." *Nixon*, 433 U.S. at 473. Bills of attainder originally referred to acts of the English parliament which subjected a specific individual or members of a particular group to death. *Id.* The prohibited acts generally aimed at "persons considered disloyal to the Crown or State" and also "commonly included [] imprisonment, banishment, and the punitive confiscation of property by the sovereign." *Id.* at 474. In the United States, the Supreme Court has added to the list of bill of attainders "legislative enactment[s] barring designated individuals or groups from participation in specified employments or vocations," which is also "a mode of punishment commonly employed against those legislatively branded as disloyal." *Id.*; *see, e.g.*, *United States v. Brown*, 381 U.S. 437 (1967) (prohibiting  Communist Party

members from serving as officers in labor unions); *United States v. Lovett*, 328 U.S. 303 (1946) (barring named individuals from government employment); *Cummings v. Missouri*, 71 U.S. 277 (1866) (prohibiting clergymen from ministry in the absence of a loyalty oath).

Here, plaintiff has not suffered anything resembling the sorts of legislative punishments historically deemed bills of attainder. Even if it finds the burden objectionable, plaintiff cannot plausibly claim that the Act's removal of the police officers' ability to bargain over the procedures that lead to discipline is "so disproportionately severe and so inappropriate to nonpunitive ends" as to constitute a bill of attainder. Unlike the historical use of the term, there is no severe burden placed on police officers' ability to live (*e.g.*, imprisonment, banishment or execution) or work (*e.g.*, barring particular employment). Finding the Act to be a bill of attainder would be a novel and inappropriate application of the term.

## B.   The Act Furthers Non-Punitive Legislative Purposes.

The second inquiry—known as the "functional test"—considers "whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes." *Nixon*, 433 U.S. at 475-76. In analyzing whether the statute functions as a punishment, "the question is not whether a burden is proportionate to the objective, but rather whether the burden is so disproportionate that it 'belies any purported nonpunitive goals.'" *Kaspersky Lab, Inc. v. U. S. Dep't of Homeland Sec.*, 909 F.3d 446, 455 (D.C. Cir. 2018) (quoting *Foretich*, 351 F.3d at 1222). The D.C. Circuit has found this

inquiry to be the "most important of the three [*Nixon* inquiries]." *BellSouth Corp.*, 144 F.3d at 65; *see Siegel v. Lyng*, 851 F.2d 412, 418 (D.C. Cir. 1988) ("The line of Supreme Court law on the Bill of Attainder Clause indicates that legislation will survive Bill of Attainder attack if the statute furthers nonpunitive legislative purposes.")

In short, the steps of conducting a functional test analysis are: "identify the purpose, ascertain the burden, and assess the balance between the two." *Kaspersky Lab, Inc.*, 909 F.3d at 455. The D.C. Circuit has offered various descriptions of what constitutes a punishment under this analysis. At times, it has described the functional test as "requiring a 'coherent and reasonable nexus' or a 'rational connection' between the burden imposed and nonpunitive purpose furthered," but it has also "used somewhat more stringent language, demanding that courts 'ensure that the nonpunitive aims of an apparently prophylactic measure [are] sufficiently clear and convincing.'" *Id.* at 456 (declining to adopt either standard because the Act satisfied the higher "clear and convincing" standard) (internal quotation marks and citations omitted). Regardless of the precise standard, the steps for conducting the analysis remain the same and show that the Act does not function as a punishment.

Here, the Act's purpose is clear, legitimate and connected to the challenged provision: ensuring that CBAs do not shield police officers from accountability or restrict the ability to properly discipline officers. *See* B23-0774 Amendment. The rationale underlying Section 116 is reasonable and sufficiently strong to avoid any appearance that it is a pretext for an invidious purpose. *See BellSouth Corp.*, 162

F.3d at 689 (finding the statute did not function as a punishment because "it [could not] be legitimately suggested that the risks of anticompetitive conduct were so feeble that no one could reasonably assert them except as a smoke screen for some invidious purpose" (internal quotation marks omitted)). Moreover, the burden the Act imposes on sworn officers is relatively minimal. The challenged provision of the Act only prohibits plaintiff's negotiation of the procedures that lead to disciplinary decisions. Under the CMPA, management already retains the sole right to discipline, and the District already affords procedures and rights to all employees facing disciplinary action. D.C. Code §§ 1-616.51-54, 1-617.08. And even without the Act, any particular disciplinary procedures for sworn officers after the current CBA would still be uncertain (being subject to future negotiation). The Act thus serves a clear purpose and imposes a minimal burden, and the functional test analysis shows that the Act is not a punishment.

### C.   The Act's Legislative Record Does Not Evince an Intent to Punish.

The third inquiry in the punishment analysis examines the legislative intent of the challenged statute and "in practice appears to differ from the second only in inviting a journey through legislative history." *BellSouth Corp.*, 144 F.3d at 67. "Under this prong, a court must inspect legislation for a congressional purpose to encroach on the judicial function of punishing an individual for blameworthy offense … [and] conduct this inquiry by reference to legislative history, the context or timing of the legislation, or specific aspects of the text or structure of the disputed legislation." *Foretich*, 351 F.3d at 1225. "[U]nmistakable evidence of punitive

intent ... is required before a Congressional enactment of this kind may be struck down" as a bill of attainder. *Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*, 468 U.S. 841, 855-56 n.15 (1984). "[S]tatutes rarely struggle to satisfy the motivational test." *Kaspersky Lab, Inc.*, 909 F.3d at 463.

Here, plaintiff has provided no legislative history that suggests the legislature intended to punish sworn law enforcement officials by passing the Act, let alone the "unmistakable evidence of punitive intent" required to constitute a violation of the Bill of Attainder Clause of the Constitution. *See Selective Serv. Sys.*, 468 U.S. at 855-56 n.15. Plaintiff alleges—without evidence or citation to the legislative record—that the Act "imputes [Minneapolis Police Department officer Derek Chauvin's murder of George Floyd] on sworn law enforcement in the District of Columbia to inflict punishment." Compl. ¶ 30; *see* Pl.'s MSJ at 16. Such baseless and conclusory statements do not amount to a plausible claim that the Act constitutes a bill of attainder. *See BellSouth Corp.*, 144 F.3d at 67 (finding no evidence of legislative punishment where plaintiff "provided no legislative history even touching on the purposes behind [the challenged provision], much less presenting 'smoking gun' evidence of congressional vindictiveness").

III. **The Act Does Not Violate the Contract Clause Because It Only Applies to Future CBAs and, to the Extent the Act Impairs Any Existing Contractual Obligations, the Impairment Is Reasonable and Necessary to Improve Police Accountability.**

The Contract Clause of the United States Constitution prohibits States from

passing laws "impairing the Obligation of Contracts." U.S. Const. Art. I, § 10, cl. 1.[3] In its Complaint and motion for summary judgment, plaintiff argues that Section 116 of the Act violates the Contract Clause on the theory that it impairs both the soon-to-be-expired CBA and all future agreements between plaintiff and the District. Compl. ¶ 37; Pl.'s MSJ at 18-19. Plaintiff does not challenge management's right to make decisions about employee discipline because, as it correctly notes, "management retain[s] the sole right to take disciplinary action against employees." Compl. ¶ 13; Pl.'s MSJ at 5; *see* D.C. Code § 1-617.08(a)(2). Instead, plaintiff challenges the Act as an alleged infringement of "the right to bargain with management concerning the disciplinary *process* employed by management." Compl. ¶ 13 (emphasis added); Pl.'s MSJ at 5. To support this argument, plaintiff cites language in Article 12, Section 2 of the current CBA, which states that the procedures for resolving employee discipline issues "*shall be incorporated into any successor [CBA]* until such time as the Committee reaches agreement on any revisions to Article 12 or the process described herein is completed." Compl. ¶ 35 (emphasis in complaint); Pl.'s MSJ at 18. Plaintiff argues that the District should be bound by the existing procedures for resolving employee discipline issues because "[t]o date, the Committee has not reached agreement on any revisions to Article 12." Compl. ¶ 35; Pl.'s MSJ at 18 (same). Plaintiff's argument lacks merit.

---

[3]   As plaintiff notes, like the States, the District is also subject to the Contract Clause. Compl. ¶ 33 (citing *Washington Teachers Union Local # 6, Am. Fed'n of Teachers, AFL-CIO v. Bd. of Educ. of the Dist. of Columbia*, 109 F.3d 774, 778 (D.C. Cir. 1997)); Pl.'s MSJ at 17 (same).

When evaluating claims raised under the Contract Clause, courts consider whether (1) a contractual relationship exists; (2) a law or regulation impairs that relationship; (3) the impairment was "substantial"; and (4) the change in the law or regulation was "reasonable and necessary to serve an important public purpose." *Washington Serv. Contractors Coal. v. District of Columbia*, 54 F.3d 811, 778 (D.C. Cir. 1995) (quoting *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 25 (1977)). As explained below, plaintiff's Contracts Clause claim must fail because the Act only applies prospectively and does not substantially impair any existing contractual obligations. Moreover, even if the Act did substantially impair an existing contractual obligation, the Act still would not violate the Contract Clause because it is a reasonable and necessary means of improving police accountability.

**A.** **The Act Does Not Violate the Contract Clause Because It Only Applies Prospectively and Does Not Substantially Impair an Existing Contractual Obligation.**

As an initial matter, plaintiff's Contract Clause claim fails because the Act does not apply to an existing contractual relationship; it only applies to future contracts entered after September 30, 2020. Comprehensive Policing and Justice Reform Second Emergency Amendment Act of 2020, D.C. Act 22-336, § 116(c)(2) (July 22, 2020). The Contract Clause's restriction on impairments of the obligations in contracts only applies to impairments of the obligations in *existing* contracts, not impairments of the obligations in any future contracts. *See, e.g.*, *McCracken v. Hayward*, 43 U.S. (2 How.) 608, 612 (1844); *Ogden v. Saunders*, 25 U.S. (12 Wheat.) 213, 262 (1827). Indeed, it is well settled that "the Contract Clause does not prohibit

the States from repealing or amending statutes generally, or from enacting legislation with retroactive effects." *U.S. Trust Co.*, 431 U.S. at 17; *see, e.g.*, *Stone v. Mississippi*, 101 U.S. 814, 821 (1879) (holding that plaintiff's lottery charter was "subject to future legislative and constitutional control or withdrawal"); *Taylor v. City of Gadsden*, 767 F.3d 1124, 1135-36 (11th Cir. 2014) (holding that "plaintiffs have no contractual right to a static, inviolable 6% contribution rate" because "[t]he City was free to amend the employee contribution rate without constitutional consequence."); *Josic v. Josic*, 397 N.E.2d 204, 206 (Ill. App. Ct. 1979) (holding that "an expectancy based upon an anticipated continuance of the existing law is not an obligation of contract within the protection of constitutional guarantees"). And a law or regulation cannot violate the Contract Clause when "there is no existing contractual relationship to be 'impaired.'" *Washington Serv. Contractors*, 54 F.3d at 818. Such is the case here.

In an attempt to avoid this issue, plaintiff contends that the language in Article 12, Section 2 of the current CBA, which is set to expire on September 30, 2020, should be read to perpetually require the District to bargain over issues of disciplinary process in the manner prescribed by the current CBA. Compl. ¶ 37; Pl.'s MSJ at 18. But plaintiff misconstrues this provision. Surely, by including this provision, it could not have been the parties' intent to bind the District in "all future collective bargaining agreements entered between the parties." Pl.'s MSJ at 18-19. A more reasonable interpretation of Article 12, Section 2 is that the procedures described are only a temporary gap-filler for the period between the expiration of the current CBA and the entry of a new agreement (assuming that disciplinary procedures were to be

29

a subject of the new agreement). And to the extent the provision is ambiguous, the ambiguity should be construed in favor of the District's interpretation. *Proprietors of Charles River Bridge v. Proprietors of Warren Bridge*, 36 U.S. (11 Pet.) 420, 558 (1837) (holding that any ambiguities contained in contracts between the government and private parties should be construed in favor of the government).

Notably, the First Circuit rejected a Contract Clause claim based on similar facts in *Local Division 589, Amalgamated Transit Union v. Massachusetts*, 666 F.2d 618 (1st Cir. 1981) (Breyer, J.). The plaintiff in that case, a transit union, challenged two statutes enacted by the Massachusetts State Legislature, alleging that the statutes impaired its CBA with the state transit agency, which contained the following provision related to arbitration procedures: "The Basic Agreement and its provisions shall continue in force until December 31, 1975 'and from year to year thereafter unless changed by the Parties' after appropriate notice." *Id.* at 620 (quoting CBA). While the parties were working on changes to the agreement, the legislature enacted two statutes making changes to the arbitration procedures in the CBA, which were intended to hold down rapidly rising transit costs. *Id.* at 620-22. Like the Act at issue in this case, the legislation that the Massachusetts State legislature passed took certain "inherent management rights" off the bargaining table. *Id.* at 622-23 and n.14.

As the court noted, the statutes would not go into effect until after the Basic Agreement had expired, which meant that they could not violate the Contract Clause. *Id.* at 637. The court found that the language of the Basic Agreement should not be read as remaining in place perpetually because "[i]t is difficult to believe that the

30

parties to the agreement thought they could bind their successors forever," and "[p]erpetual contracts would seem to be particularly inappropriate in the field of labor relations." *Id.* at 638. Instead, the court concluded that the provision should be interpreted as only remaining in effect "for a reasonable time" after the expiration of the agreement, in which case there would be no violation of the Contract Clause.[4] *Id.*

In any event, the court found that even if the provision were interpreted as continuing in perpetuity, there still would be no violation of the Contract Clause. For instance, even if the legislation at issue impaired an existing contractual obligation, the impairment was not substantial. *Id.* at 638-41. As the court pointed out, "It is difficult to see how the promise that a particular arbitration procedure would be used indefinitely into the future—beyond the life of the express terms of the existing agreement—could have played more than a small role in an employee's decision to work for the MBTA." *Id.* at 640. Therefore, the court concluded, the legislation did not violate the Contract Clause "even if, as a matter of state law, the Basic Agreement is still in effect." *Id.* at 643.

The same is true in this case. The District did not impair an existing contractual obligation with plaintiff, and even if had, such as by breaching the soon-to-expire CBA, it would not qualify as a substantial impairment of a contractual obligation for purposes of the Contract Clause. *Cf. Cherry v. Mayor and City Council of Balt. City*, 762 F.3d 366, 371 (4th Cir. 2014) (holding that "[a] state or municipality

---

[4]     Like the CBA provision at issue in *Local Division 589*, the CBA provision plaintiffs challenge here should only remain in effect for "a reasonable time" after the current CBA expires.

does not 'impair the obligation of contracts' merely by breaching one of its contracts or by otherwise modifying a contractual obligation"); *Am. Fed'n of Gov't Emps., Local 2741 v. District of Columbia*, 689 F. Supp. 2d 30, 36 (D.D.C. 2009) (holding that the District's breach of a CBA did not qualify as a legislative impairment). Therefore, plaintiff's Contract Clause claim must fail.

### B.  <u>Even If the Act Did Substantially Impair an Existing Contractual Obligation, It Still Would Not Violate the Contract Clause Because It Is a Reasonable and Necessary Means of Improving Police Accountability.</u>

Importantly, even if the Act did substantially impair an existing contractual obligation, that still would not mean that the Act violates the Contract Clause. "[A] finding that there has been a technical impairment is merely a preliminary step in resolving the more difficult question whether that impairment is permitted under the Constitution." *U.S. Trust Co.*, 431 U.S. at 21. "Although the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'" *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 410 (1983) (quoting *Home Bldg. and Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434 (1934)). Therefore, the Supreme Court has found, "Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order." *Blaisdell*, 290 U.S at 435. "[T]he Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty," *U.S. Trust Co.*, 431 U.S. at 23, because, as the Supreme Court has long held, "the legislature cannot bargain

away the police power of a State." *Stone v. Mississippi*, 101 U.S. 814, 817 (1879); *see Butler v. Pennsylvania*, 51 U.S. (10 How.) 402, 416-17 (1850) (holding that the "general power to enact and repeal laws … and to create, and change or discontinue, the agents designated for the execution of those laws … is indispensable for the preservation of the body politic, and for the safety of the individuals of the community"); *Local Division 589*, 666 F.2d. at 638-39 (stating that "[t]he Contract Clause does not make unlawful every state law that conflicts with any contract that contains terms contrary to its provisions" because "[a]ny such interpretation would make of the clause an insuperable barrier to necessary state legislation" and "threaten to make the Constitution unworkable").

For this reason, laws and regulations that substantially impair contractual obligations are still constitutionally permissible if they "have a significant and legitimate public purpose … such as the remedying of a broad and general social or economic problem." *Energy Reserves Grp., Inc.*, 459 U.S. at 411-12 (internal citation omitted). "Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'" *Id.* at 412 (quoting *U.S. Trust Co.*, 431 U.S. at 22) (alterations in original).

As discussed above, *see* Section I.B., the Act was passed for a legitimate public purpose—improving police accountability as a remedy for the broad and general social problem of police brutality and misconduct, particularly against Black people.

33

Plaintiff attempts to dispute this point by arguing that "the Act only serves the illegitimate purpose of Punishing" the Union and its members and that the District is improperly imputing the conduct of police officers in Minnesota to members of the D.C. Police Union. *See, e.g.*, Compl. ¶ 38; Pl.'s MSJ at 19. But that argument is directly undermined by the Act's legislative history. For example, the emergency resolution accompanying the first emergency bill expressly stated:   "This comprehensive emergency legislation *enhances police accountability and transparency* through the implementation of numerous reforms and best practices." Emergency Declaration Resolution, PR23-0826, § 2(j) (emphasis added).[5] As grounds for reform, the emergency resolution cited protests and the deaths of Black people across the Nation, as well as in the District. *See generally id.* Additionally, an amendment to the first emergency bill, which added the provision in the Act plaintiff is challenging, included an express statement of the contested language's policy rationale; namely, to prevent the Union from using the collective bargaining process "to shield employees from accountability" and restrict MPD's ability to properly discipline officers. B23-0774 Amendment. Plaintiff's contention that the Act lacked a legitimate public purpose is baseless.

Moreover, it was certainly reasonable for the Council to conclude that the Act's changes to the discipline process were a necessary and appropriate means of

---

[5]     The second emergency declaration resolution expressly incorporated the intent stated in the first emergency declaration resolution. *See* Second Emergency Declaration Resolution, PR 23-0872, § 2(b).

improving police accountability. The Council's determination should be entitled to deference because "[a]s is customary in reviewing economic and social regulation … courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *U.S. Trust Co.*, 431 U.S. at 22-23; *see City of El Paso v. Simmons*, 379 U.S. 497, 508-09 (1965) (stating that the government has "the sovereign right to protect the general welfare of the people" and that courts "must respect the wide discretion on the part of the legislature in determining what is and is not necessary" toward that end) (internal quotation marks omitted).

In *U.S. Trust Co.*, the Court found that "*complete* deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." 431 U.S. at 25-26 (emphasis added). But lack of *complete* deference does not mean no deference. *Local Division 589*, 666 F.2d. at 641. And unlike *U.S. Trust Co.*, this is not a case that "involves a financial obligation" of the government. *U.S. Trust Co.*, 431 U.S. at 24-25. The purpose of the legislation was to protect the public, not for the District to evade its financial obligations, so there is little reason not to defer to the District's legislative judgment. *See Local Division 589*, 666 F.2d at 643 (stating that "determining the 'reasonableness and necessity' of a particular statute is a task far better suited to legislators than to judges" and "where economic or social legislation is at issue, some deference to the legislature's judgment is surely called for").

Plaintiff's contention that the Act singles out only one union does not render the Act unreasonable. Compl. ¶ 38; Pl.'s MSJ at 19. Indeed, laws or regulations that

are tailored to a specific group are frequently upheld as a reasonable and necessary means of advancing an important public purpose. *See, e.g.*, *Energy Reserves Grp., Inc.*, 459 U.S. at 418 (finding that it was reasonable for legislature to enact price control legislation to protect consumers from high gas prices while exempting businesses producing the types of new gas that Congress sought to encourage); *Classic Cab, Inc. v. District of Columbia*, 288 F. Supp. 3d 218, 228-29 (D.D.C. 2018) (holding that regulation requiring taxicab operators to transition from analog metering systems to calculate fares to system designed to run on mobile devices did not violate Contract Clause by impairing taxicab operators' existing contract with provider of analog meters because the regulation was reasonable and necessary to serve the important public purpose of modernizing common carriers). What is more, "[t]he fact that a law is triggered by a specific event, [and] the fact that the Legislature realizes the law will apply to that event as well as the persons involved in it, certainly does not—or should not—affect the validity of legislation." *Matter of Coruzzi*, 472 A.2d 546, 576 (N.J. 1984). Indeed, "[a] significant portion of all laws and amendments passed by a legislature have their origin in just such specific circumstances," and "[i]f legislation triggered by a particular situation clearly requiring a legislative remedy is invalid for that reason, the law would be helpless to address many societal needs." *Id.*

Plaintiff may disagree with the policy of removing employee discipline from the bargaining table, or even think it is counterproductive, but whether the law at issue is "wise or unwise as a matter of policy" is irrelevant for purposes of the Contract

Clause. *Blaisdell*, 290 U.S at 447-48. Even if the Act substantially impaired an existing contract (which it does not), plaintiff simply cannot refute that the Act was a reasonable and necessary means of promoting an important public purpose.

**IV.    The Act Does Not Violate Plaintiff's Substantive Due Process Rights Because It Does Not Deprive Plaintiff of a Life, Liberty or Property Interest, and Even If It Did, that Deprivation Was Rationally Related to a Legitimate Government Purpose.**

Plaintiff's substantive due process claim relies on the theory that the Due Process Clause of the Fifth Amendment "prohibits legislative enactments that prevent or infringe upon the exercise of fundamental economic rights, such as the right to contract, where the act is not 'justified by a rational legislative purpose.'" Compl. ¶ 40 (quoting *Ass'n of Bituminous Contractors, Inc. v. Apfel*, 156 F.3d 1246, 1255 (D.C. Cir. 1998)). Plaintiff claims a substantive due process right "to bargain for terms inextricably linked to [officers'] employment with the MPD as well as their property right to employment with the MPD." Pl.'s MSJ at 19. But these allegations do not establish a substantive due process violation.

The Due Process Clause protects individuals from unconstitutional deprivations of life, liberty and property. U.S. Const. amend. V.[6] A government violates the substantive component of the Due Process Clause when it deprives a person of life, liberty or property in a manner that "shocks the conscience," *United*

---

[6]    The District of Columbia is subject to the requirements of the Fifth Amendment Due Process Clause, which contains an equal protection component that is considered substantially the same as that in the Fourteenth Amendment. *See Fraternal Order of Police v. United States*, 152 F.3d 998, 1002 (D.C. Cir. 1998) ("Equal protection analysis is substantially identical under the Fifth Amendment and the Fourteenth") (subsequent history omitted).

*States v. Salerno*, 481 U.S. 739, 746 (1987) (quoting *Rochin v. California*, 342 U.S.165, 172 (1952)), or that is not rationally related to a legitimate state interest, *Wash. Teachers Union Local # 6 v. Bd. of Educ. of the District of Columbia*, 109 F.3d 774, 781 (D.C. Cir. 1997). Here, plaintiff cannot establish a substantive due process violation because it has not alleged that it has been deprived of a constitutionally protected interest, and even if it had, any such deprivation was rationally related to the legitimate government interest in improving police accountability.

### A.   Plaintiff Does Not Allege that It Has Suffered Deprivation of a Constitutionally Protected Interest.

Plaintiff contends that Section 116 of the Act violates its substantive due process rights "to bargain for terms inextricably linked to [officers'] employment with the MPD as well as their property right to employment with the MPD." Pl.'s MSJ at 19. Plaintiff characterizes the current CBA's terms related to the discipline process as "critical terms *related to* [officers'] employment." Pl.'s MSJ at 20 (emphasis added); *see also* Compl. ¶ 42 (stating that Section 116 of the Act "eliminates their right to bargain and enter into a contract through the D.C. Police Union for terms directly *related to* discipline stemming from their employment.") (emphasis added). Although plaintiff suggests that its members have a constitutionally protected interest in their continued employment, the Act does not deprive any of them of employment. And even if the Act has some indirect effect on their property interest in employment, plaintiff's substantive due process claim still fails because "the due process provision of the Fifth Amendment does not apply to the indirect adverse effects of governmental action." *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 787, 789 (1980). Those

38

indirect effects "do[ ] not amount to a deprivation of any interest in life, liberty, or property." *Id.* To state a claim for relief based on a substantive due process theory, plaintiff must articulate a deprivation of a valid life, liberty or property interest instead of merely an indirect *effect* on those interests. Plaintiff has not done so.

Collective bargaining over discipline is, at most, a *process* by which the union seeks to protect its members' interest in their continued employment. This is an entitlement to "nothing but procedure," which is not a basis for a protected property interest. *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 764 (2005). "[T]he mere existence of a particular procedure, without more, does not create any substantive liberty or property interest" and "the failure to make the procedure available in a particular case does not constitute a deprivation of constitutional magnitude." *Valentine v. Drug Enforcement Admin. of U.S. Dep't of Justice*, 544 F. Supp. 830, 835 (N.D. Ill. 1982). And any interest plaintiff claims to possess in specific terms in the CBA is not a valid interest for purposes of a substantive due process claim. *See, e.g.*, *Local 342, Long Island Pub. Serv. Emps. v. Town Bd. of Huntington*, 31 F.3d 1191, 1196 (2d Cir. 1994) ("We do not think, however, that simple, state-law contractual rights, without more, are worthy of substantive due process protection. Such rights are not the type of 'important interests that have heretofore been accorded the protection of substantive due process.'"); *Classic Cab, Inc.*, 288 F. Supp. 3d at 225 (finding no substantive due process violation when the challenged regulation "[a]t most … had the *effect* of reducing or eliminating the contract's value").

Plaintiff also suggests that it has a constitutionally protected interest in being able to collectively bargain over the disciplinary process. But the disciplinary process for employees is a permissive subject of bargaining, not a mandatory one, which means that the District is not required to bargain over that issue. *See Drivers, Chauffeurs and Helpers Local Union No. 639 v. District of Columbia*, 631 A.2d 1205 (D.C. 1993) (noting that the District's Public Employee Relations Board has adopted the Supreme Court's distinction between mandatory and permissive subjects of bargaining). And even if the CBA did require the District to bargain with plaintiff over the discipline process for employees, failure to do so still would not constitute a deprivation of a life, liberty or property. *See Am. Fed'n of Gov't Emps., Local 2741*, 689 F. Supp. 2d at 34 and n.3, 36 (holding that the District's termination of employees—in alleged violation of CBA provision requiring the District to consult with management prior to contracting out or privatizing positions—did not violate plaintiff's substantive due process rights). Therefore, "plaintiff['s] substantive due process claim … does not meet the threshold for such a violation." *Id.* at 36.

B.   **Even if Plaintiff Had Adequately Alleged a Deprivation of a Constitutionally Protected Interest, This Still Would Not Violate the Due Process Clause Because the Act Was Rationally Related to a Legitimate Government Interest.**

Even if plaintiff could point to a constitutionally protected interest that was adversely affected by the Act, plaintiff cannot meet its burden of establishing "no rational connection" between the District's actions and the interests the Council advanced by enacting the legislation. *Washington Teachers Union Local # 6*, 109 F.3d at 781. Plaintiff argues that Section 166 "lacks, and is not justified by, a rational

40

legislative purpose," Compl. ¶ 44, but as discussed above, *see* Section I.B., the Act is rationally related to the legitimate interest in improving police officer accountability.

Plaintiff further argues that Section 116 constitutes a "grave unfairness" because it removes its right to bargain over the process for discipline "based entirely on animus for sworn law enforcement officers." Pl.'s MSJ at 20. Yet plaintiff provides no support for its assertion that the legislation was driven by animus toward sworn law enforcement personnel. At most, plaintiff alleges that it disagrees with removing the discipline process from the bargaining table from a policy standpoint. But a government employee's disagreement with laws or regulations that may have an impact on that individual's employment does not render the law or regulation irrational. *Washington Teachers Union Local # 6*, 109 F.3d at 781. Like the rest of plaintiff's constitutional claims, its substantive due process claim fails.

## V. The Act Does Not Violate the Home Rule Act.

Plaintiff also argues that the Act violates the Home Rule Act based on the theory that violations of the Constitution also violate the Home Rule Act. In the Complaint, plaintiff alleges that all four of its claims are a violation of a provision of the U.S. Constitution "and the District of Columbia Home Rule Act." *See generally* Compl. And in its motion for summary judgment plaintiff argues that "[a]n act of the District, the Mayor, or the Council which violates the restrictions and requirements of the Constitution of the United States also violates the D.C. Home Rule Act." Pl.'s MSJ at 21.

Plaintiff's claim under the Home Rule Act is dependent on a violation of some provision of the Constitution, but as explained above, plaintiff cannot establish a violation of any of the four constitutional provisions it has raised in the Complaint. Thus, even assuming plaintiff can bring a claim under the Home Rule Act in this context, it cannot succeed. And even if plaintiff *could* establish a constitutional violation under one of these theories, plaintiff's claim under the Home Rule Act should still be dismissed as duplicative. *See Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 81 (D.D.C. 2010) ("As a matter of judicial economy, courts should dismiss duplicative claims.").

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiff's motion for summary judgment, and grant the District's cross-motion to dismiss the Complaint or, in the alternative, for summary judgment.

Dated:  September 4, 2020.          Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Chief, Equity Section

*/s/ Pamela A. Disney*
PAMELA A. DISNEY [1601225]
GAVIN N. PALMER [1619264]
Assistant Attorneys General
400 Sixth Street, N.W., Suite 10100

42

Washington, D.C.  20001
(202) 807-0371
pamela.disney@dc.gov

*Counsel for Defendants*