## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE FRATERNAL ORDER OF POLICE,
METROPOLITAN POLICE DEPARTMENT
LABOR COMMITTEE, D.C. POLICE
UNION,

        Plaintiff,

v.

THE DISTRICT OF COLUMBIA, et al.,

        Defendants.

Civil Action No.  1:20-cv-02130

## REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO CROSS-MOTION TO DISMISS PLAINTIFF'S COMPLAINT OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

The Plaintiff, the Fraternal Order of Police, Metropolitan Police Department Labor Committee, D.C. Police Union ("D.C. Police Union"), by its attorneys, and pursuant to FED. R. CIV. P. 12(b) and 56 and Local Rule 7, hereby submits this Reply to Defendants' Opposition to Plaintiff's Motion for Summary Judgment and Cross-Motion to Dismiss Plaintiff's Complaint or, in the Alternative, for Summary Judgment and, in support, the D.C. Police Union states the following:

### A. The Act Treats the D.C. Police Union Differently Than Similarly-Situated Groups and is Not Rationally Related to Any Legitimate Purpose.

Defendants argue that Plaintiff has failed to allege that the Act[1] treats the D.C. Police Union and its members differently than similarly-situated citizens of the District, and that "[s]uch an omission is fatal to [Plaintiff's] equal protection clause claim." *See* Opp. & Cross-Motion at

---

[1]     The "Comprehensive Policing and Justice Reform Second Emergency Amendment Act of 2020," Act No. A23-0336.

11-12.  However, the Act itself explicitly applies to "sworn law enforcement personnel," thereby drawing the express distinction between members of the Metropolitan Police Department ("MPD") and every other public employee of the District.  The D.C. Police Union's Complaint alleges the same, stating that other public employees and labor unions in the District are not subject to the disciplinary bargaining limitations imposed upon MPD officers through the Act. *See* Compl. ¶¶ 16, 21-22.

Defendants argue that such allegations are conclusory and warrant dismissal or summary judgment.  Opp. & Cross-Motion at 11-12.  However, the Act itself draws the explicit conclusion that members of the MPD are to have their rights stripped away to the exclusion of the District's other public employees.  Although this allegation could be categorized as conclusory, it does not appear to be disputed that the Act has stripped no other public employees or unions in the District of the right to bargain over the disciplinary rules and procedures that apply to their employment.

The cases cited by Defendants illustrate that while conclusory allegations of differential treatment are insufficient where the challenged statute or decision is *facially neutral*, the Act here is facially discriminatory in that it uniquely and expressly disfavors and disenfranchises D.C. Police Union members.  *See Texas Border Coalition v. Napolitano*, 614 F.Supp.2d 54, 65-66 (D.D.C. 2009) (dismissing equal protection claim because the plaintiffs had failed to allege how the facially-neutral condemnation proceedings affected the plaintiffs, as a class, differently than other persons who were the subject of condemnation proceedings); *see also BEG Investments, LLC v. Alberti*, 85 F.Supp.3d 13, 31-34 (D.D.C. 2015) (dismissing equal protection claim because the plaintiff failed to allege how a facially-neutral licensing condition of providing a police detail on nights when certain music genres were played discriminated against African-

Americans); *see also Mpras v. District of Columbia*, 74 F.Supp.3d 265, 267, 271-72 (D.D.C. 2014) (ruling that the plaintiff had failed to state an equal protection violation where the plaintiff alleged, without more, that the facially-neutral denial of certain photographic identification "denied equal protection of the laws").

Contrary to the Defendants' argument, the D.C. Police Union is similarly situated to other public employees and unions that engage in the same police-related activity, but are nonetheless left untouched by the Act. *See* Opp. & Cross-Motion at 11-13. As with the D.C. Police Union, the Fraternal Order of Police maintains labor committees (*i.e.*, unions) for public employees in four other departments and agencies within the District: (1) the District of Columbia Department of Corrections; (2) the District of Columbia Housing Authority; (3) the District of Columbia Department of General Services' Protective Services Division; and (4) the District of Columbia Department of Youth Rehabilitation Services. Critically, the public employees under these FOP unions all share substantial similarities to D.C. Police Union members, including the ability to make arrests, the ability to carry non-lethal and lethal weapons, and the ability to legally use physical force on the District's citizens. *See* D.C. Code § 6-223 (conferring on the Housing Authority Police Department "the same powers, including the power of arrest . . . as a member of the Metropolitan Police Department" and authorizing the carrying of handguns).

Additionally, each of these unions operate under their own collective bargaining agreements that contain express disciplinary procedures distinct from the procedures afforded under the CMPA. *See* FOP/Department of Corrections Labor Committee CBA, attached as **Exhibit 1** at Art. 10 and Art. 11, § B (providing that discipline may be grieved through the CBA's grievance procedures, which include the right to both mediation and arbitration); *see also* FOP/Protective Services Division Labor Committee CBA, attached as **Exhibit 2**, at Art. 8 and

Art. 9, § H (providing that more severe discipline may be grieved through the CBA's grievance procedures, which provide for arbitration and which specify that "[o]nly the Union may advance a grievance to arbitration"); *see also* FOP/Department of Youth Rehabilitation Services Labor Committee CBA, attached as **Exhibit 3**, at Art. 24, § 1(C), and Art. 26 (providing that discipline may be grieved through the CBA's grievance procedures, which include the right to both mediation and arbitration). These similarly-situated employees are equally responsible for public safety and given extraordinary powers to do their job, including the ability to use force when appropriate. Thus, the same purported need for "accountability" is present with these employees, whose unions have retained the right to bargain with management over discipline. Indeed, the Department of Youth Services has been under court supervision since 1986 as a result of a consent decree that sought to rectify constitutional shortcomings in the Department of Youth Services.[2]  Contrary to Defendants' assertion, the D.C. Police Union's members are not "uniquely responsible for public safety," given that other public employees spread over four of the District's agencies have the same allegedly "unique" responsibilities concerning public safety and are authorized to use force on individuals, including vulnerable populations such as inmates and minors.

Defendants' contention that "the CMPA also imposes limits on the extent to which government attorneys can bargain over discipline," is similarly without merit. *See* Opp. & Cross-Motion at 13 (citing D.C. Code § 1-608.56). D.C. Code § 1-608.56 does not restrict the bargaining rights of government attorneys, but rather, sets forth a limitation on the appeal rights for government attorneys to the Mayor or to the Attorney General without prohibiting their right to bargain over matters concerning discipline. Defendants also contend that D.C. public school teachers are limited in negotiating over "evaluations." *See* Opp. & Cross-Motion at 4. While

---

[2] *See* https://dyrs.dc.gov/sites/default/files/dc/sites/dyrs/page_content/attachments/The%20Consent%20Decree.pdf.

D.C. Code § 1-617.18 states that the "evaluation process" for District of Columbia Public Schools employees is non-negotiable, the disciplinary process for teachers in the District remains subject to bargaining. *See* D.C. Code § 1-617.18; *see also* CBA for the Washington Teachers Union, Local #6 of the American Federation of Teachers, attached as **Exhibit 4**, at 40 (setting forth the disciplinary procedures afforded to District teachers under the Washington Teachers Union Local #6 CBA). Notably, despite the fact that D.C. Code 1-617.18 states that the "evaluation process" for D.C. public school employees is non-negotiable, the CBA for the Washington Teachers Union contains several provisions and rights concerning evaluations, such as the "rights to appeal below average or unsatisfactory performance evaluations" through various levels, making management's "compliance with the evaluation process . . . subject to the grievance and arbitration procedure." *See id.* at 49-50.

Defendants argue that the Act does not violate the Equal Protection Clause because its discriminatory text is rationally related to the allegedly legitimate goal of police accountability. *See* Opp. & Cross-Motion at 14.[3] In citing several cases articulating that rational-basis review requires deference to a legislature's decision, the purported goal asserted by the Council is not supported by any data, formal studies, or even public hearings or testimony, but is plainly backed by current public animosity towards police.

---

[3] Defendants request that this Court take judicial notice of certain academic articles as support for the assertion that Section 116 of the Act is a means to further the purpose of "police accountability." *See* Opp. & Cross-Motion at 16 n.2. However, a court may only take judicial notice of facts that are "not subject to reasonable dispute" in that they are either "generally known [in] the territorial jurisdiction of the trial court or . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Weinstein v. Islamic Republic of Iran*, 175 F.Supp.2d 13, 16 (D.D.C. 2001) (quoting Fed. R. Ev. 201(b)). The facts that Defendants seek to have the Court take judicial notice of are not matters that are within common knowledge or that can be determined through sources whose accuracy is unquestionable. Indeed, all of the academic articles cited by Defendants appear to be mere *opinions*. Therefore, this Court should not take judicial notice of the matters expressed in Footnote 2 of Defendants' Opp. & Cross-Motion.

Even under the rational basis test, a "bare . . . desire to harm a politically unpopular group" cannot constitute a legitimate governmental interest. *Trump v. Hawaii*, 138 S.Ct. 2392, 2420 (2018) (quoting *U.S. Dep't of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973)). Animosity and a lack of a rational basis can be inferred when the legislative means are too attenuated from the purported ends: "[the law's] sheer breadth is so discontinuous with the reasons offered for it that the [law] seems inexplicable by anything but animus toward the class it affects; it lacks a rational relationship to legitimate state interests." *Romer v. Evans*, 517 U.S. 620, 632 (1996).

The Act was passed on an emergency basis immediately following protests concerning the death of George Floyd in Minnesota. The first Resolution concerning the Act cited those protests and the other protests that have occurred across the United States as a result of recent tragedies in which police officers were involved. *See* Comprehensive Policing and Justice Reform Emergency Declaration Resolution of 2020, PR 23-430, at 1. The Resolution explicitly stated that the Council would follow the will of those protesting unproven, yet sensationalized allegations of police misconduct by officers outside of the District: "The Council must listen to the voices of District residents and act accordingly to bend the arc of justice." *Id.* at 2.

The legislative history surrounding the Act supports the indisputable fact that the "emergency" Act was adopted to appease protestors espousing anti-police rhetoric, and was rooted in events that occurred completely outside of the District. At the Council's legislative meeting on the temporary, first version of the Act, which included Section 116 at issue, several Councilmembers expressed that the purpose of the Act was rooted in the demands of protestors and the conduct of a member of the Minneapolis Police Department, wholly unrelated and unaffiliated with the D.C. Police Union or its members, as follows:

- Councilmember Allen: "My duty to pursue justice, no matter the obstacles or the people in power that stand in the way."
  *See* http://dc.granicus.com/MediaPlayer.php?view_id=2&clip_id=5470 at 50:24.
- Councilmember Grosso: "The system and structure of policing in our city and our country is one of violence and racism and the moment demands bold action to pare that back." *Id.* at 1:12:10.
- Councilmember Grosso: "[These amendments] are all directly responsive to the outpouring of community demands for fundamental changes to the police." *Id.* at 1:12:45.
- Councilmember Grosso: "I have received, as all of us have, thousands of emails from District of Columbia residents, in just the past few days, asking that we reduce police budgets . . . and changing policing practices. These amendments, along with provisions already in the underlying emergency bill, go directly to those demands." *Id.* at 1:12:50.
- Councilmember Gray: "Over the last two weeks, so much of which was spurred over the life and murder of one man, George Floyd, and the egregious situation that occurred with him." *Id.* at 2:41:04.
- Councilmember White: "I'm concerned that as we move through the budget with the momentum we have now and the demands that that we're seeing every minute in our emails, that some members may get hesitant to take necessary and bold steps forward because we're waiting on a report." *Id.* at 3:03:23.

The Council further disregarded Mayor Bowser's request in which she "urge[d] the Council to allow a process where these issues can receive robust public discourse, which I believe will only help to increase community buy-in on any proposed reforms." *Id.* at 55:00. Significantly, Councilmember Bonds recognized and conceded that instances of police brutality were not prevalent in the District as follows: "[We've discussed] issues of brutality. We, thank goodness, haven't had a lot of that from our police force, but now, the images have heightened our concerns." *Id.* at 3:07:58. As such, the legislative history makes clear that the Council imputed injustice, racism, and police brutality occurring in other parts of the country to D.C. Police Union's members. The legislative history further shows that the Council did not want to wait on reports or public hearings, but instead chose to act hastily as a reactionary concession to anti-police rhetoric and protests being carried out by a small but vocal group of citizens who had gained significant political influence.

Furthermore, the means of the Act are so disproportionately attenuated from its purported ends that there is an inference that the Act is actually fueled by animus against D.C. Police Union members.   Defendants assert that the purpose of the Act is to improve police accountability.  *See* Opp. & Cross-Motion at 14-17.  Under the Act, the means for doing so are to remove disciplinary procedures from negotiation in collective bargaining agreements *entirely*. However, there is no evidence that a single Councilmember ever read or consulted the D.C. Police Union's CBA before voting on the Act and no explanation provided on how stripping the D.C. Police Union of its right to bargain over discipline will somehow improve accountability. In addition, the Council did not identify a single provision of the parties' CBA that somehow impeded accountability, nor did they hold hearings or seek testimony from the Chief of Police to inquire into whether there were provisions in the CBA that impaired accountability.

Indeed, many of the provisions contained in Article 12 of the CBA governing discipline help to ensure that discipline is administered in a manner that comports with due process, thereby decreasing the likelihood that discipline will be overturned based on an error or a due process violation committed by the MPD.  For example, Article 12, Section 4 and Section 7 require that the MPD provide a D.C. Police Union member with written notification of the charges prior to imposing adverse action.  *See* Plaintiff's MSJ, Exhibit 2 at 15.  The D.C. Police Union member is then permitted to respond in writing, and the Chief of Police has an opportunity to respond to the employee's written statement.  However, the Chief's response constitutes final agency action, at which time the proposed discipline is imposed if upheld by the Chief.  This process ensures that D.C. Police Union members receive their due process right to be heard by the employer prior to the imposition of discipline, and also establishes a set procedure for this process to occur in a timely manner.  This process does not remove the final decision on discipline from the Chief of

Police and does not preclude the Chief from imposing discipline in a swift manner.  Indeed, even the right to appeal certain suspensions and terminations only accrues *after* the Chief has imposed final agency action and the member has been suspended or terminated.  Again, the right to appeal to an arbitrator does not in any way impede the Chief's ability to take swift disciplinary action.  Thus, by taking away the D.C. Police Union's right to bargain over discipline, it appears that the Council wants the Chief of Police to have the ability to summarily discipline or terminate D.C. Police Union members without first providing them with basic due process rights aimed at ensuring that discipline is properly imposed in a fair manner.  In doing so, the D.C. Council is actually attempting to shield MPD management from any accountability on how it imposes discipline and is opening up all future discipline to due process challenges.

The Defendants have proffered a *post hoc* rationale for the legitimacy of Section 116 of the Act, however, the facts and circumstances demonstrate that Section 116 is rooted in animus against D.C. Police Union members and is an attempt by Defendants to appease politically vocal groups that demanded retribution against police officers in other parts of the country under the guise of change.  There is no rational basis for Section 116 and, this provision in the Act violates the Equal Protection Clause.

**B.  The Balancing of Relevant Factors Demonstrates that Section 116 of the Act is a Bill of Attainder in that it Imposes Legislative Punishment.**

First, it must be noted that the Parties appear to be in agreement that the "specificity" prong necessary for a Bill of Attainder claim is met on the facts at issue.  The Defendants admit that the Act satisfies the specificity prong and also concede that the requirement of specificity is arguable irrelevant under current jurisprudence.  *See* Opp. & Cross-Motion at 21.  As a result, the issue for the Court to decide is whether the Act imposes "punishment."

Whether a statute imposes legislative punishment depends upon the following factors: (1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, considering the type and severity of the burden imposed, can reasonably be said to further a non-punitive purpose; and (3) whether the legislative history evinces an intent to punish. *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Security*, 909 F.3d 446, 455 (D.C. Cir. 2018) (citations omitted). Significantly, the United States Court of Appeals for the District of Columbia Circuit considers the second factor to be the weightiest. *See id.* (quoting *Foretich v. United States*, 351 F.3d 1198, 1218 (D.C. Cir. 2003)); *see also* Opp. & Cross-Motion at 23-24 (stating that the second factor is the "most important").

The second factor is informed by a balancing test to determine whether the statute functions for its purportedly non-punitive purpose: "[C]ases make clear that where there exists a significant imbalance between the magnitude of the burden imposed and a purported nonpunitive purpose, the statute cannot reasonably be said to further nonpunitive purposes." *Foretich*, 351 F.3d at 1221; *Kaspersky*, 909 F.3d at 455-56. Furthermore, the D.C. Circuit has held that there must at least be a "rational connection between the burden imposed and the nonpunitive purposes." *Id.*; *see Kaspersky*, 909 F.3d at 456. Inherent in that "rational connection" analysis is consideration of whether the offending statute is underinclusive; in other words, whether the statute "burdens one among equals." *Kaspersky*, 909 F.3d at 456.

Defendants assert that the Act is intended ensure that collective bargaining agreements do not "shield" police officers from discipline. Opp. & Cross-Motion at 24. However, as stated above, the Council did not identify a provision of the parties' CBA that somehow shielded D.C. Police Union members from discipline, nor did they hold hearings or seek testimony from the Chief of Police to inquire into whether there were specific provisions in the CBA that somehow

prevented the MPD from imposing discipline.  Instead, the legislative history shows that the purpose of the Act was rooted in the demands of protestors and the specific incident concerning George Floyd and the Minnesota officer's use of force.

However, "use of force" incidents constitute only one basis for which a D.C. Police Union member could be investigated and disciplined.  Notably, the MPD currently has several processes and procedures in place to ensure officer accountability in use of force incidents.  For example, the MPD has an extensive General Order governing all use of force investigations, which requires that all serious use of force investigations are conducted by the MPD's Internal Affairs Division.  *See* **Exhibit 5** at 4.  Moreover, the Internal Affairs Division is required to consult with the United States Attorneys' Office in all serious use of force incidents to allow the U.S. Attorneys' Office to determine whether it will pursue criminal charges against the officer involved in the use of force.  *See id*. at 14.  All use of force incidents investigated by the Internal Affairs Division are also then reviewed by the MPD's Use of Force Review Board, which is authorized to make its own determination as to whether the use of force was justified or unjustified.  *See* **Exhibit 6**.  Notably, none of these required procedures (nor bargaining over them) are in any way affected by the ban on bargaining over discipline in the Act.

In spite of the Act being precipitated by a use of force incident, the provision at issue is not limited to discipline involving allegations of an officer's use of force.  Rather, the Act completely strips the D.C. Police Union members of the right to negotiate over the disciplinary process for *any* factual predicate of proposed discipline.  Given that discipline arising out of use of force incidents are a fraction of the types of disciplinary proceedings that could be imposed upon a police officer, Section 116 of the Act is grossly disproportionate, strongly suggesting that it is a legislative punishment.  Moreover, some of the disciplinary procedures provided in Article

12 of the CBA have no connection to the purported goal of furthering police accountability, which further illustrate that the means employed through Section 116 of the Act are grossly disproportionate to its purported ends.  *See* § A, *supra*.

Additionally, the Act is underinclusive, in that it selectively targets and disenfranchises the D.C. Police Union's members while leaving untouched other police unions in the District that are similarly authorized to use physical and lethal force against the District's citizens.  *See* § A, *supra*.  There is no rational basis or rational connection between the Act and its purported purpose.  *See id.*  The Act is both underinclusive and imposes a burden that is grossly disproportionate to its purported nonpunitive purpose.  As a result, the second and most important factor in analyzing a bill of attainder strongly supports that the Act is a legislative punishment and impermissible.

Although the second factor alone supports that the Act imposes legislative punishment, the remaining two factors likewise support that conclusion.  Concerning the first factor, Defendants argue that the Act does not fall under the historical meaning of legislative punishment because it does not impose the draconian punishments of execution or imprisonment common in antiquity, or the overt blacklisting of Communist sympathizers during the era of McCarthyism.  *See* Opp. & Cross-Motion at 22-23.  However, Courts wary of the ability of legislatures to concoct new ways of punishing disfavored classes have expanded the concept of "punishment" for bill-of-attainder analysis:

> In the last two centuries, legislatures have innovated beyond death and banishment. But as punishments evolved over time, so too did the courts' interpretation of the Clause. "Our treatment of the scope of the Clause has never precluded the possibility that new burdens and deprivations might be legislatively fashioned that are inconsistent with the bill of attainder guarantee." **It is the job of the courts to "prevent[ ] Congress from circumventing the clause by cooking up newfangled ways to punish disfavored individuals or groups."**

*Kaspersky*, 909 F.3d at 454 (internal citations omitted) (emphasis added).  Thus, simply because the Act does not attempt to impose the obvious punishments that have accompanied past bills of attainder (*e.g.*, execution, imprisonment, barring employment based upon political beliefs, etc.) does not imply that the Act is not a bill of attainder.  Notably, in expanding the application of the Bills of Attainder Clause, Courts have struck down laws that infringe upon a person's employment.  *See e.g.*, *United States v. Brown*, 381 U.S. 487 (1965) (invalidating as bill of attainder a statute that criminalized a member of the Communist Party from serving as an officer in any labor union).  The Act here dismantles the longstanding right to negotiate for disciplinary procedures enjoyed by the D.C. Police Union's members and all other members of unions in the District, and places the sole right to formulate those procedures into the hands of an employer that, if the historical relationship between unions and employers in the United States is any indication, has no incentive to provide any procedural safeguards before imposing discipline upon its employees.  The Act places Plaintiff's members at the complete mercy of the MPD in disciplinary matters, eliminating any ability to negotiate over procedures that will protect and preserve the members' due process.  The Act is such a substantial and severe infringement on the members' employment as police officers that it is of the same quality as legislative punishments that have outright barred disfavored classes from employment or associational opportunities.  The Act is not valid simply because the Council has succeeded in "cooking up newfangled ways" to punish the now-disfavored police officers of the District.  *See Kaspersky*, 909 F.3d at 454.

Finally, the Act's legislative history evinces an intent to punish Plaintiff's members. Critically, the absence of a rational connection between a statute's purpose and the means employed to achieve that purpose may support an inference that "the legislature's purported

nonpunitive objective serves as a 'smokescreen' for some undisclosed punitive purpose." *Kaspersky*, 909 F.3d at 455 (citation omitted).  As detailed in § A, *supra*, the Act was drafted and passed on a claimed "emergency" basis.  In reality, there was no legislative emergency; it was instead advanced without study or debate to placate vocal protests that called for comprehensive dismantling of the employment rights enjoyed by D.C. Police Union members, without regard to data-supported evidence, independent inquiry, or clear-headed investigation.  Additionally, the Council explicitly resolved to appease the citizens who were demanding retribution under the guise of change.  *See* Comprehensive Policing and Justice Reform Emergency Declaration Resolution of 2020, PR 23-430, at § 2(i).  Furthermore, the complete removal of the right to negotiate over the disciplinary process is not rationally connected to the clear impetus of the Act being rooted in *use of force* incidents specifically, rather than the whole catalogue of possible bases for disciplinary actions.

Considered as a whole, the three factors above demonstrate that Section 116 of the Act is nothing more than a legislative punishment imposed for the sake of appeasing a vocal political movement through that punishment.  The D.C. Police Union members have been summarily subjected to unproven charges  by the Council for actions that none of its members committed, and were punished without any form of public hearing or trial.  The actions by the Council are a modern-era bill of attainder.

C. <u>**Article 12, § 2, of the CBA is an Existing Contractual Right that is Substantially Impaired.**</u>

Defendants first argue that the Act does not impair Plaintiff's CBA because it only covers future CBA's and the current CBA expires on September 30, 2020.  *See* Opp. & Cross-Motion at 28-31.  Defendant's argument ignores that Article 12, § 2 of the current CBA guarantees that the rights in Article 12 "shall be incorporated into any successor Collective Bargaining Agreement."

14

This guarantee of a right was mandated to be included in future CBA's and it has been taken away by the Act.    While the Contracts Clause applies to existing contractual rights, the Defendants ignore that an existing contractual right can also extend into the future and be incorporated into future contracts, as the parties explicitly agreed would occur with the current guarantees of Article 12 of the CBA.

Defendants cite *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1 (1977), for the principle that "the Contract Clause does not prohibit the States from repealing or amending statutes generally, or from enacting legislation with retroactive effects." *Id.* at 17.  However, the Act here does not repeal or amend a statute in a manner that takes away a statutory right relied upon by contractual parties, but, rather, specifically targets and nullifies the terms of Plaintiff's CBA itself.  *See* Motion for Summary Judgment, Exhibit 1 at 12.

Defendants also cite *Stone v. Mississippi*, 101 U.S. 814 (1879), which involved a charter granted by Mississippi to a private entity to conduct lotteries.  *Id.* at 816.  In considering the validity of a Mississippi constitutional amendment that prohibited lotteries in the state, the Supreme Court at no point stated that the charter was not an existing contract, but instead based its decision entirely upon its view that regulating lotteries, perceived at the time as a "widespread pestilence," was within Mississippi's police power and that the charter, although impaired, could not inhibit the sovereign police power of the state.  *Id.* at 817-21.

Likewise, the remaining cases cited by Defendants did not involve questions of whether a contract existed, but rather, involved other aspects of the Contracts Clause analysis.  *See Taylor v. City of Gadsden*, 767 F.3d 1124, 1133-36 (11th Cir. 2014) (ruling that 2.5% increase in an employee's obligation to contribute to a pension fund, where that obligation had been increased repeatedly in the decades prior, did not substantially impair the employee's contract); *see also*

*Josic v. Josic*, 397 N.E.2d 204, 206 (Ill. App. Ct. 1979) (ruling that abrogation of a prior statutory right to modify the parties' contract, without altering the terms of the contract itself, did not violate the Contracts Clause).

Defendants further assert that "it could not have been the parties' intent to bind the District in 'all future collective bargaining agreements entered between the parties.'"  Opp. & Cross-Motion at 29 (citing Plaintiff's MSJ at 18-19).   However, that assertion is purely speculative and discounts the unambiguous terms of Article 12, § 2, of the CBA.  "Courts interpret collective bargaining agreements according to the general rules of contract law . . . ."  *Holland v. Freeman United Coal Mining Co.*, 574 F.Supp.2d 116, 129 (D.D.C. 2008).  "Where the language of a contract is clear and unambiguous on its face, a court will assume that the meaning ordinarily ascribed to those words reflects the intentions of the parties."  *Mesa Air Group, Inc. v. Dep't of Transportation*, 87 F.3d 498, 503 (D.C. Cir. 1996) (quoting *NRM Corp. v. Hercules Inc.*, 758 F.2d 676, 681 (D.C. Cir. 1985)).  Thus, whether the District intended to convey a right or guarantee that would be binding to future agreements is of no consequence where the unambiguous language binding it has been expressed in an agreement entered into.

In this case, Article 12, § 2 of the CBA could not be more clear in its statement that Article 12 specifically is to be incorporated into subsequent agreements, even after the expiration of the current CBA.  The full text reads as follows:

> The current Article 12, as set forth in the parties' existing collective Bargaining Agreement, **shall remain in full force and effect** during the Committee's deliberations **and shall be incorporated into any successor Collective Bargaining Agreement** until such time as the Committee reaches an agreement on any revisions to Article 12 or the process described herein is completed.

Plaintiff's MSJ, Exhibit 2 at 14 (emphasis added).  The key words in this section are "remain," "incorporated," and "successor."   "Remain" means "to be a part not destroyed, taken, or used

up," "to stay in the same place or with the same person or group," and "to continue unchanged." https://www.merriam-webster.com/dictionary/remain (last accessed September 9, 2020). "Incorporated" means "[t]o declare that another document shall be taken as part of the document in which the declaration is made as much as if it were set out at length therein." https://thelawdictionary.org/incorporate/ (last accessed September 9, 2020). "Successor" means "[o]ne who succeeds to the rights . . . of another," and "one that follows." https://thelawdictionary.org/successor/ (last accessed September 9, 2020); https://www.merriam-webster.com/dictionary/successor (last accessed September 9, 2020).

In light of the ordinary meanings set forth above, the intent of the parties was expressed in unambiguous terms. Although the CBA had a distinct beginning and end, the parties agreed that this section of the CBA would be carried forward and incorporated into the next CBA, if any, if the Committee described in Article 12 could not reach an agreement as to any revisions to Article 12. There is no genuine dispute, and Defendants agree, that "[t]o date, the Committee has not reached agreement on any revisions to Article 12." *See* Plaintiff's Statement of Undisputed Facts at ¶ 12; *see also* Defendants' Response to Plaintiff's Statement of Undisputed Facts at 7. Because the Committee has not reached agreement on revisions to Article 12, Article 12 will continue into subsequent collective bargaining agreements entered into by the Parties. Therefore, Article 12 is an existing, and will continue to be an existing, contractual right that is subject to the Contracts Clause's protections from impairment.

Defendants also cite to an out-of-Circuit case for the proposition that Article 12 § 2 should not be interpreted, according to its unambiguous terms, as extending past the expiration date of the current CBA. *See* Opp. & Cross-Motion at 30-31. However, the case cited by Defendants involved a collective bargaining agreement that attempted, through its terms, to keep

17

*the entire agreement* in place perpetually, thereby precluding the contractual parties from ever terminating the agreement. *See Local Division 589, Amalgamated Transit Union, AFL-CIO, CLC v. Massachusetts*, 666 F.2d 618, 620 (1st Cir. 1981). Although the First Circuit expressed doubt that such an agreement could be read literally, it noted that "it is conceivable that state courts reviewing the Basic Agreement in related cases" will conclude that the agreement was validly perpetual. *Id.* at 638. Indeed, the Defendants concede that pursuant to *Local Division 589*, Article 12 should "remain in effect for a 'reasonable time' after the current CBA expires." Opp. & Cross-Motion at 31, n. 4. In any event, Defendants' citation to this out-of-Circuit case should not dictate the Court's decision here, and should not disturb the plain terms of the CBA that incorporate Article 12 into future collective bargaining agreements.

Defendants further argue that Article 12 § 2, even if considered an existing contractual right, is not substantially impaired by Section 116 of the Act. Defendants support their argument that there is no substantial impairment by citing cases that hold that a government's breach of contract is not an impairment of the contract for Contract Clause purposes. *See* Opp. & Cross-Motion at 31-32. However, there is no allegation that Defendants have breached the CBA in this matter; rather, Defendants have legislatively interfered with and substantially impaired Plaintiff's contractual rights under the CBA.

Plaintiff bargained for the terms of the CBA, including the disciplinary procedures contained within Article 12. There is no doubt that the District's police officers relinquished some of their rights in return for the procedural due process protections agreed to in Article 12. *See* Plaintiff's MSJ, Exhibit 2 at 4-5 (conveying broad rights to management and prohibiting the Plaintiff and its members from involvement in labor strikes). Moreover, the disciplinary procedures set forth in Article 12 are not inconsequential. Article 12 is the carefully-crafted

product of decades of labor relations between Plaintiff and the MPD, and includes over a dozen different provisions conferring various rights upon Plaintiff's members, including, but not limited to, the following: (1) the right to contest and respond to disciplinary charges; (2) the right to a Departmental hearing concerning certain disciplinary charges; (3) the right to an attorney during a Departmental hearing on proposed termination; (4) the right to advanced notice of the implementation of proposed discipline; (5) the right to appeal proposed discipline to the Chief of Police and to appeal the Chief's decision to an independent arbitrator; and (6) the provision that certain discipline will not affect an officer's promotional opportunities.  Plaintiff's MSJ, Exhibit 2 at 15-16 (§§ 3, 4, 5, 7, 8, 11).  Many of these rights mirror the constitutional and procedural rights enjoyed by parties in litigation and are clearly substantial enough to warrant protection under the Contracts Clause.

Other courts have considered far less significant impairments of existing contracts to constitute substantial impairment for purposes of the Contracts Clause.  *See e.g., Baltimore Teachers Union, Am. Federation of Teachers Local 340 AFL-CIO v. Mayor and City Council of Baltimore*, 6 F.3d 1012, 1014, 1017-18 (4th Cir. 1993) (holding that statute that imposed a 0.95% decrease in public teachers' annual salaries was a substantial impairment); *University of Hawai'i Professional Assembly v. Cayetano*, 183 F.3d 1096, 1100, 1104-1106 (1999) (holding that statute that delayed payment of wages by one to three days on six occasions throughout a year, without decreasing wages, was a substantial impairment).  In a recent decision of the Supreme Court of North Carolina the court addressed a law that repealed a statute concerning "career status."  The law at issue retroactively stripped career status from teachers that had already obtained that rank, and diluted, but did not destroy, the disciplinary procedures previously enjoyed by career status teachers.  *North Carolina Association of Educators, Inc. v.*

*North Carolina*, 786 S.E.2d 255, 782-83 (N.C. 2016).   Achieving career status conferred a variety of statutory benefits upon a teacher, including rights specific to disciplinary procedure, such as limiting discipline to specific grounds, providing for "written notice of the grounds on which [the proposed discipline] was justified," the right to a hearing, the right to counsel at that hearing, and the right to appeal to "the full school board."  *Id.* at 782.  In considering a challenge to the law on the basis of the Contracts Clause, the North Carolina Supreme Court held that the law substantially impaired the vested contractual rights of "career status" teachers, referring repeatedly to the teachers' loss of disciplinary safeguards and loss of benefits concerning "enhanced job security."  *Id.* at 790-91.  Like the career status teachers in this case, Plaintiff's members currently enjoy substantial disciplinary safeguards and procedural rights under the CBA, and, but-for the Act, had a guaranteed and vested right to enjoy those benefits in the future by virtue of their current CBA.  Unlike the North Carolina legislature, Defendants have not simply diluted Plaintiff's contractual rights, but have removed those rights entirely.

Defendants also argue the Act is valid because it is a reasonable and necessary means of improving police accountability.  *See* Opp. & Cross-Motion at 32.  The Defendants provide no support, study, facts, or legislative history to support the conclusion that taking away a parties' collective bargaining rights over disciplinary procedures somehow enhances accountability. What is clear and is detailed in § A and § B, *supra*, is that the Act furthers the illegitimate purpose of punishing Plaintiff's members, who, due to events that occurred outside of the District, are the politically-disfavored.  Even assuming that the Act's purported intent is one that was genuinely held, the Act violates the Contracts Clause because it is neither *reasonable* nor *necessary* to achieve that purpose.

In *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1 (1977), the Supreme Court stated that a statute was not reasonable because the alleged reason for the statute "was not a new development." *Id.* at 31. Although the Act was adopted without any showing of how the District is experiencing issues of police accountability caused by procedural processes the District government agreed to in the parties' CBA, there is certainly no "new development" in the District that prompted the Act. Indeed, the initial Resolution concerning the Act cited the death of Mr. Terrence Sterling, which occurred on September 11, 2016, *nearly four years prior to the Act's passage*. *See* Comprehensive Policing and Justice Reform Emergency Declaration Resolution of 2020, PR 23-430, at 2; *see also* https://www.nbcwashington.com/news/local/dc-police-board-fatal-shooting-of-unarmed-motorcyclist-terrence-sterling-was-unjustified/33602/ (last accessed September 9, 2020). More puzzling is how disciplinary procedures bear any connection to this death. Such a logical, factual, and temporal disconnect indicates that the Act is unreasonable. Furthermore, as discussed in § B, *supra*, the Act's impairment of the CBA is grossly disproportionate to its purported purpose, which is tied to use of force incidents and not to the whole catalogue of possible disciplinary circumstances, such as mere tardiness, insubordination, or uniform or equipment violations. That lack of proportionality further demonstrates that the Act is unreasonable.

Moreover, the wholesale removal of disciplinary procedure from the collective bargaining table is unnecessary. The determination of necessity is informed by two factors: (1) whether the substantial impairment was "essential"; and (2) whether the legislature could have adopted "alternative means" of achieving the statute's stated purpose. *See U.S. Trust Co.*, 431 U.S. at 29-30. Both of those factors suggest that the Act's impairment of the CBA was unnecessary. First, removal of negotiation over disciplinary processes was not essential, as the

Council did not articulate any objective facts, studies, or investigations indicating that the District was experiencing issues with police accountability because of existing procedures. Indeed, the unfortunate case of Mr. Sterling illustrates that any aberrant actions of police officers in the District are transparently rectified through the current disciplinary procedures set forth in the CBA.  *See* https://www.nbcwashington.com/news/local/officer-who-killed-terrence-sterling-fired/149700/ (reporting that the officer who shot Mr. Terrence was terminated after utilizing the current CBA's disciplinary procedures) (last accessed September 9, 2020).

Second, there are numerous alternative means that could be utilized to achieve the purpose of police accountability.  The D.C. Council could have and did pass legislation further regulating use of force incidents.  *See* Section 106 of the Act, attached as Exhibit 1 to MSJ (expanding the members of the Use of Force Review Board to include: "Three civilian members appointed by the Mayor," "One member who has personally experienced the use of force by a law enforcement officer," "One District resident community member," and "Two civilian members appointed by the Council with . . . no current or prior affiliation with law enforcement.").  If the Council studied the issue and found that the data supported particular disciplinary procedures impeded discipline, it could have addressed these issues.  In fact, one area that the D.C. Council apparently believed was causing an impediment to discipline was D.C. Code § 5-1031 (the "90-day rule").  In response, the Council expanded the time period for the MPD to commence adverse action against an officer for serious use of force or potential criminal conduct to 180-days after the date of the occurrence at issue.  *See id*. at Section 117, p. 13.

The Defendants' reliance on *Classic Cab, Inc. v. District of Columbia*, 288 F.Supp.3d 218 (D.D.C. 2018) for its contention that a law directed at a specific group can be upheld as reasonable is misplaced.  In that case, the District passed a series of laws aimed at transitioning

22

the District's taxicabs from utilizing analog fare systems to "digital taxicab solutions," the latter of which were becoming popular due to the proliferation of Uber and Lyft services.  *Id.* at 222-23.  The purpose for the series of laws was clear: to modernize the District's taxicab industry in order to compete with popular rideshare services like Uber and Lyft.  The *only* way in which that purpose could be achieved was through the requirement that the District's taxicabs use the same technology employed by the private rideshare companies that were attracting riders who would have otherwise used ordinary taxicabs.  *See id.*  In contrast, the Defendants' purported purpose for the Act, which is to improve police accountability does not warrant the over-encompassing, drastic step of removing disciplinary procedures from the negotiating table.  There are numerous ways, such as those expressed above, that police accountability could be studied, and where warranted by the facts, improved in a logical and less burdensome way than removing all of Plaintiff's bargained-for rights over discipline.  Unfortunately, the Council saw fit to move forward on an emergency basis to swiftly eradicate the entire process that governed the parties' disciplinary system for decades, and in doing so violated the Constitution's Contracts Clause.

### D.  <u>Section 116 of the Act Violates Plaintiff's Substantive Due Process Rights</u>.

Defendants first argue that, assuming that Section 116 of the Act impacts Plaintiff's property interests, that impact is merely an "indirect adverse effect."  Opp. & Cross-Motion at 38 (quoting *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 787, 789 (1980)).  However, the types of indirect adverse effects that are not within the scope of the Substantive Due Process Clause are those that are not specifically sought by the given governmental action.  *See O'Bannon*, 447 U.S. at 775-76, 787-90 (ruling that decertification of a nursing home for failing to meet statutory requisites for receipt of Medicare and Medicaid reimbursements did not violate the rights of the *residents* of that nursing home, since the governmental action was keyed

towards maintaining certain standards for the nursing home).  In the instant case, Section 116 of the Act explicitly targets and destroys the disciplinary procedures that Plaintiff's members have bargained for pursuant to their collective bargaining agreement.  Therefore, the deprivation of Plaintiff's property rights is not merely incidental, but is explicit and intentional.

Defendants next argue that Article 12 of the CBA is "nothing but procedure," for which there can be no property interest.  Opp. & Cross-Motion at 39 (citing *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 764 (2005)).  However, unlike *Town of Castle Rock*, Plaintiff does not argue that it has a right to the execution of discretionary procedures, but rather that Defendants have retroactively destroyed the vested contractual rights that, unlike benefits in private employment agreements, were not freely granted but were instead obtained through arduous, decades-long negotiations through which Plaintiff's members sacrificed important employment rights in return for the procedural rights enumerated in Article 12 of the CBA.  *Cf. Town of Castle Rock*, 545 U.S. at 756, 760-64.  Plaintiff's members do not seek preferential enforcement of certain procedures that were freely granted by statute or other law; rather, Plaintiff merely seeks to prevent Defendants from upending the vested contractual rights that were obtained only through sacrifice of other rights in the bargaining process.

Finally, Defendants repeat the argument addressed in the preceding sections that Section 116 of the Act has a rational basis and is not informed by animus towards police officers. However, for the same reasons articulated above, Plaintiff has alleged facts to sufficiently show that there is no rational basis for the Act and any purported reasoning behind the Act and Section 116 specifically is a mere pretext for the impermissible animus that fueled passage of the Act. *See* §§ A, B, *supra*.

E.  **Section 116 of the Act Violates the Home Rule Act**.

Plaintiff has sufficiently alleged, and proven for purposes of summary judgment, the foregoing constitutional violations.  As such, Defendants have likewise violated the District of Columbia Home Rule Act.  Furthermore, although Defendants' violations of the Home Rule Act are rooted in constitutional violations, Plaintiff's claims under the Home Rule Act are not duplicative because the Home Rule Act is a distinct body of law applicable only in the District of Columbia that is co-extensive with the rights afforded under the United States Constitution.

**V.**
**Conclusion**

For all of the foregoing reasons, Plaintiff has sufficiently pled facts to support all of the claims in its Complaint and, thus, should survive Defendants' Motion to Dismiss.  Additionally, for all of the foregoing reasons and for the reasons expressed in Plaintiff's Motion for Summary Judgment, there is no genuine dispute as to the material facts in this case and, under the applicable law, Plaintiff is entitled to summary judgment as a matter of law on all counts.

Respectfully submitted,

/s/ *Anthony M. Conti*
Anthony M. Conti (D.C. Bar No. 479152)
Daniel J. McCartin (D.C. Bar No. 976580)
CONTI FENN LLC
36 South Charles Street, Suite 2501
Baltimore, Maryland  21201
(410) 837-6999
(410) 510-1647 (facsimile)

Attorneys for Plaintiff

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on the 11th day of September, 2020, a copy of the foregoing Reply to Defendants' Opposition to Plaintiff's Motion for Summary Judgment and Opposition to Cross-Motion to Dismiss Plaintiff's Complaint or, in the Alternative, for Summary Judgment was served via the Court's electronic filing system on counsel of record for Defendants.

/s/ *Anthony M. Conti*
Anthony M. Conti (D.C. Bar No. 479152)