## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRATERNAL ORDER OF POLICE, METROPOLITAN POLICE DEPARTMENT LABOR COMMITTEE, D.C. POLICE UNION, <br><br> Plaintiff, <br><br> v. <br><br> DISTRICT OF COLUMBIA, *et al.*, <br><br> Defendants. | Civil Action No. 20-02130 (JEB) |

## DEFENDANTS' REPLY IN SUPPORT OF
## CROSS-MOTION TO DISMISS PLAINTIFF'S COMPLAINT
## OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

### INTRODUCTION

In its opposition to defendants'[1] motion to dismiss or, in the alternative, for summary judgment, plaintiff[2] fails to establish that the Comprehensive Policing and Justice Reform Second Emergency Amendment Act of 2020, D.C. Act 23-336, 67 D.C. Reg. 9148 (July 31, 2020) (the Act), is unlawful under any theory. As the District argued in its motion, the Council of the District of Columbia (the Council) passed the Act to address issues related to systemic racism, police brutality, misconduct and accountability. Plaintiff challenges one provision of the Act, Section 116, which

---

[1]     Defendants are the District of Columbia and Mayor Muriel Bowser (collectively, the District).

[2]     Plaintiff is the Fraternal Order of Police, Metropolitan Police Department (MPD) Labor Committee, D.C. Police Union.

renders discipline of sworn law enforcement personnel a non-negotiable management right in any collective bargaining agreements (CBAs) entered after September 30, 2020. Plaintiff argues that Section 116 is unlawful under the Equal Protection Clause, the Bill of Attainder Clause, the Contract Clause, the Due Process Clause and the District of Columbia's Home Rule Act. But plaintiff cannot prevail under any of these theories. Plaintiff's Complaint should therefore be dismissed or, in the alternative, the Court should grant summary judgment for the District.

ARGUMENT

I.    <u>Plaintiff Cannot Establish an Equal Protection Clause Violation Because It Has Not Alleged that the Act Treats Plaintiff Differently than Other Similarly Situated Public-Sector Unions, and the Act Survives Rational Basis Review.</u>

    A.    <u>Plaintiff Is Not Similarly Situated to Other Public Unions on Matters of Discipline.</u>

Plaintiff's equal protection claim fails because plaintiff does not show that the Act treats sworn law enforcement personnel differently from other employees who are similarly situated for purposes of employee discipline. *See* Defs.' Mem. in Supp. of Opp'n to Pl.'s Mot. for Summ. J. and Cross-Mot. to Dismiss or for Summ. J. [9-1] (Mot.) at 11-13. Plaintiff argues that the Act's exclusive application to "sworn law enforcement personnel" qualifies as disparate treatment. Pl.'s Reply to Defs.' Opp'n to Mot. for Summ. J. and Opp'n to Defs.' Cross-Mot. to Dismiss or for Summ. J. [10] (Opp'n) at 2. But plaintiff's mere allegation that it is treated differently than other unions does not establish that it is *similar* to those unions. *Noble v. U.S. Parole Comm'n*, 194 F.3d 152, 154 (D.C. Cir. 1999) (stating that the Equal Protection Clause "does not require all persons everywhere be treated alike … [but rather] that the

2

government not treat *similarly situated* individuals differently without a rational basis") (emphasis in original) (citations omitted).

The District has shown that plaintiff is not similarly situated to other unions because of the special protections that plaintiff's members receive with respect to discipline *See, e.g.*, D.C. Code §§ 5-133.06 (providing trial boards for disciplinary determinations), 5-1031 (limiting the time in which disciplinary action can be brought); Mot. at 13. This alone precludes a showing of being similarly situated. And plaintiff has no response to this.

Plaintiff also misreads the caselaw when it suggests that "conclusory allegations of differential treatment [are] insufficient where the challenged statute or decision is *facially neutral*," but are sufficient here because the statute is targeted. *See* Opp'n at 2 (emphasis in original). Plaintiff cites no authority suggesting that such a distinction exists in the law. For example, plaintiff misreads *B.E.G. Investments, LLC v. Alberti*, 85 F. Supp. 3d 13 (D.D.C. 2015), by suggesting the holding was that the plaintiff there failed to state an Equal Protection Clause claim because the plaintiff challenged a "facially neutral licensing condition." Opp'n at 2-3. But in fact, much like this case, *B.E.G. Investments* involved allegations that the plaintiff was directly targeted by government action:   an agency required it, unlike other businesses, to obtain a police detail as a prerequisite for obtaining a liquor license. 85 F. Supp. 3d at 19. The plaintiff's equal protection claim still failed in that case because pleading such a claim requires more than an allegation that a plaintiff has been

singled out or treated dissimilarly from dissimilar persons. *Id.* at 33. The same is true here, and plaintiff cannot state an equal protection claim.

To the extent plaintiff argues that being uniquely prohibited from negotiating over discipline is sufficient to establish a claim under the Equal Protection Clause, its argument rests on a faulty premise. Plaintiff states that the Comprehensive Merit Personnel Act (CMPA) does not limit attorneys bargaining over discipline, Opp'n at 4, but that is incorrect. Plaintiff concedes that the CMPA "sets forth a limitation on the appeal rights for government attorneys" but asserts that this does not amount to a limitation in bargaining power. *Id.* Then, contradictorily, plaintiff argues that the potential loss of the right to appeal suspensions and terminations to an arbitrator *is* a procedural right at stake in the CBA negotiations. *See id.* at 9. Plaintiff's admission that limitations on the right to appeal disciplinary decisions are limitations on the right to bargain over disciplinary procedures belies plaintiff's argument that the type of limitation the Council has imposed is unique to plaintiff.

Plaintiff also argues that it "is similarly situated to other public employees and unions that engage in the same police-related activity." Opp'n at 3. But that, too, is incorrect. Plaintiff cites unions for the Department of Corrections, the Housing Authority and the Department of Youth Rehabilitation Services as examples of similarly situated law enforcement unions, *id.*, but the members of these unions do not have the same accountability to the general public, or the same broad jurisdiction, as MPD officers do. Indeed, the Act specifically seeks to address District resident concerns regarding "racism in policing, the use of force, lack of police accountability

and transparency, and systemic racial injustice and inequity" as well as the "troubling relationship" many District residents have with law enforcement. *See* Comprehensive Policing and Justice Reform Emergency Declaration Resolution of 2020 (Emergency Declaration Resolution), PR23-0826, § 2(j) (June 9, 2020). Sworn law enforcement officials in the District are uniquely accountable to the general population in addressing these concerns. Thus, they are not similarly situated to other public employees who perform "police-related" work. *See* Opp'n at 3.

Even if the accountability issues the Council sought to address in the Act were similarly applicable to other "police-related" unions, the Council did not have to address all of these other unions, too, for the Act to satisfy the Equal Protection Clause. Even if other law enforcement personnel, for example, should ideally be barred from negotiating disciplinary procedures, "the Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all." *Dandridge v. Williams*, 397 U.S. 471, 486-87 (1970); *see Nat'l Ass'n for Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043, 1052-53 (9th Cir. 2000) (rejecting argument that California's "psychology licensing laws have no rational basis because [its] licensing schemes for other, similar counseling professions are less stringent"). The Equal Protection Clause "does not compel … [l]egislatures to prohibit all like evils or none. A legislature may hit at an [issue] it has found, even though it has failed to strike at another." *United States v. Carolene Prods. Co.*, 304 U.S. 144, 151 (1938). Plaintiff's allegations that the Act is underinclusive do not render the Act constitutionally impermissible.

Similarly, plaintiff cannot establish an equal protection violation under rational basis review "merely because the classifications made by [the] law are imperfect." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 84 (2000) (alterations and internal quotation marks omitted). As the Supreme Court has acknowledged, "[d]efining the class of persons subject to a regulatory requirement … inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line," and whether "the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." *FCC v. Beach Commc'ns*, 508 U.S. 307, 315-16 (1993) (internal quotation marks omitted). Rough, imperfect, unscientific and underinclusive classifications are all permissible. *See Kimel*, 528 U.S. at 84; *Beach Commc'ns*, 508 U.S. at 313-16 and n.7. Here, plaintiff provides no authority suggesting any problem with the Council's approach in specifically identifying plaintiff in Section 116, which is properly a matter of legislative deference under rational basis review.

### B.   The Act Is Rationally Related to the Legitimate Interest in Enhancing Police Accountability.

At base, plaintiff misconstrues the Act's legislative history in its effort to discredit the Act's legitimate rationale. Plaintiff incorrectly alleges that the resolution in support of the Act "explicitly stated that the Council would follow the will of those protesting unproven, yet sensationalized allegations of police misconduct" that was "wholly unrelated and unaffiliated with the D.C. Police Union or its members." Opp'n at 6. Plaintiff offers no record support for these assertions. In fact, plaintiff's own cherry-picked quotations from the Council's discussion of the Act

6

contradict these arguments and show that Councilmembers intended for the Act to address legitimate issues in the District. *See, e.g.*, Opp'n at 6-7 (Councilmember Grosso noting problems with the "system and structure of policing in our city," stating that Amendments to the Act "are all directly responsive to the outpouring of community demands for fundamental changes to the police," and citing "thousands of emails from District of Columbia residents" regarding police reform). Plaintiff ignores that the legislative record shows a legitimate rationale for passing the Act, including Section 116—namely, enhancing police accountability. *See* Mot. at 15-16.

Even if the Council looked to tragedies and reform efforts in other jurisdictions as the impetus for passing the Act, that analysis would not undermine the legislation's rational basis. The fact that Councilmembers cited the death of George Floyd in Minnesota and noted that there were not "a lot" of incidents of police brutality in the District does not evince any improper motive on the part of the Council. *See* Opp'n at 7. It is certainly rational for legislatures to enact legislation aimed at preventing a tragedy or serious problem, rather than waiting for such a tragedy or problem to arise in its jurisdiction before taking action.

Plaintiff also improperly speculates about the motive and impact of the legislation. Plaintiff asserts—again, without citation to the legislative record—that "the Council wants the Chief of Police to have the ability to summarily discipline or terminate" officers without due process. Opp'n at 9. Plaintiff's accusation is baseless. Plaintiff provides no evidence of such an intent or possible legislative effect on officer discipline. Indeed, Section 116's potential effect on officer discipline is unclear, and

plaintiff's speculation about future disciplinary matters is not grounds for an Equal Protection Clause claim. Moreover, the Act does not impair protections already in place that ensure due process. *See, e.g.*, D.C. Code §§ 1-616.51-54 (guaranteeing employees certain rights regarding grievances and disciplinary actions, including the right to appeal adverse disciplinary decisions).

Plaintiff's contention that the Act is "not supported by any data [or] formal studies" is a red herring. *See* Opp'n at 5. Such evidence is not necessary to establish a rational basis. *See* Mot. at 15-16; *Beach Commc'ns*, 508 U.S. at 315 ("[A] legislative choice is not subject to courtroom fact-finding and *may be based on rational speculation* unsupported by evidence or empirical data.") (emphasis added). Plaintiff cites no authority to support its assertions that such evidence is required, and plaintiff fails to acknowledge controlling caselaw that directly contradicts it. Indeed, the law is clear that empirical evidence is not required for a finding of rationality.[3]

Here, plaintiff plainly fails to meet its burden to show why the Act lacks even a *conceivably* rational basis. At the motion to dismiss stage, a plaintiff alleging an equal protection violation must adequately allege no "conceivable state of facts that could provide a rational basis for the classification." *Hettinga v. United States*, 677 F.3d 471, 479 (D.C. Cir. 2012) (per curiam) (quoting *Dumaguin v. Sec'y of Health and Human Servs.*, 28 F.3d 1218, 1222 (D.C. Cir. 1994)). At most, plaintiff offers

---

[3]    Plaintiff opposes the Court taking judicial notice of articles and studies supporting the need for the specific type of reform at issue on grounds that they contain "mere *opinions*." *See* Opp'n at 3 n.5 (emphasis in original). But the District seeks judicial notice of the *existence* of the articles and studies, not the truth of their contents, and thus judicial notice is appropriate here. *See* Fed. R. Evid. 201(b).

"unsupported and conclusory allegations" that the Act lacks a rational basis, which is not enough to state an equal protection claim. *Texas Border Coal. v. Napolitano*, 614 F. Supp. 2d 54, 65-66 (D.D.C. 2009) (citing *Bois v. Marsh*, 801 F.2d 462, 466 n.5 (D.C. Cir. 1986)); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) ("[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"). Here, the Council's stated rationale for the Act and, specifically, Section 116—enhancing police accountability in the District—is certainly a "conceivable" basis for prohibiting plaintiff from negotiating on matters of discipline. *See Frazier v. D.C. Dep't of Emp't Servs.*, 229 A.3d 131, 141 (D.C. 2020) (plaintiff must "make a clear showing of arbitrariness and irrationality, and must negat[e] every conceivable basis which might support it") (citation omitted). Plaintiff fails to meet its burden here and, as a result, fails to state an equal protection claim.

## II.   The Act Is Not a Bill of Attainder Because It Does Not Impose a Punishment.

### A.   The Act Furthers Non-Punitive Legislative Purposes.

The most important factor for analyzing a bill of attainder claim is "whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 475-76 (1977). Courts analyze this factor to determine whether the statute *functions* as a punishment. *See Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 455 (D.C. Cir. 2018) ("[T]he question is not whether a burden is proportionate to the objective, but rather whether the burden is so disproportionate that it belies any purported nonpunitive goals.") (internal quotation

marks omitted). In assessing the balance between the purpose of the Act and the burden imposed by it, plaintiff argues that the burden is "grossly disproportionate" to the Act's non-punitive ends. Opp'n at 11. In support of this argument, plaintiff repeats many of the faulty arguments it made in support of the Equal Protection Clause claim, all of which are also unpersuasive here.

First, plaintiff argues that the Act's "underinclus[ion]"—applying to plaintiff, but not other police-related unions—shows that it punishes plaintiff, and cites *Kaspersky Lab, Inc.* for its claim that "inherent in the rational connection analysis is consideration of whether the offending statute is underinclusive." Opp'n at 10-11. But the *Kaspersky* court did not find this determinative in a punishment analysis; in fact, it found that a rule prohibiting the use of the plaintiff's products—and only plaintiff's products—did not qualify as a bill of attainder. *Kaspersky Lab, Inc.*, 909 F.3d at 456. Similarly, here, the fact that the Act applies to only one union does not suggest that the Council intended to punish plaintiff.

Second, plaintiff argues that the Act is *over*inclusive, and complains that the Act seeks to address only use-of-force incidents even though discipline may cover other types of incidents too. Opp'n at 11-12 But the Act's purpose is not limited to addressing only use-of-force incidents. For example, the Council cites the "enduring systems of institutional racism" and, specifically, the "troubling relationship" many District residents have with law enforcement as part of the reason for Act. *Id.* The Council's goal of addressing these broad issues could be furthered by enhancing police accountability for incidents that do not involve the use of force. And, even if the Act

seemed overly broad, such overinclusion would still not be evidence of punishment. *See Kaspersky Lab, Inc.*, 909 F.3d at 458 ("The fact that Kaspersky can imagine slightly less restrictive measures does not demonstrate that the law Congress actually chose amounts to punishment.").

Third, plaintiff again incorrectly claims that the legislative history supports a finding that the Section 116 is not rationally connected to the Act's purported goals. Opp'n at 10-11. Plaintiff argues that the "legislative history shows that the purpose of the Act was rooted in the demands of protestors and the specific incident concerning George Floyd and the Minnesota officer's use of force." Opp'n at 10. And plaintiff continues to argue that the lack of specific evidence—here, "hearings or testimony from the Chief of Police"—is persuasive evidence of punishment. Opp'n at 10. Even if these statements were true, plaintiff does not cite to any authority, legislative record or case law to support its analysis. In fact, the legislative history shows that the Act sought to enhance the goal of furthering police accountability, and prohibiting plaintiff from negotiating over discipline matters is rationally connected to that goal. *See* Mot. at 24-25.

Moreover, plaintiff overstates the burden that Section 116 of the Act imposes by taking the current disciplinary procedures off the bargaining table. An accurate assessment of the burden imposed on plaintiffs is essential to determining "whether the burden is so disproportionate that it belies any purported nonpunitive goals." *Kaspersky Lab, Inc.*, 909 F.3d at 455. Contrary to plaintiff's assertion, the burden imposed here is minimal, and especially insignificant compared to the serious issues

the Act seeks to address. *See* Mot. at 24-25. Section 116 of the Act only prohibits plaintiff's negotiation of the procedures related to disciplinary decisions, a decision already retained by management under the CMPA. D.C. Code § 1-617.08. Further, the Act does not mandate any specific changes to the discipline procedures, so the Act's effect on the discipline procedures is not clear. And, even without the Act, any particular disciplinary procedures currently provided to sworn officers could change after the current CBA expires. Thus, the Act cannot be considered a bill of attainder.

**B.**   **The Act Does Not Fall Within the Bill of Attainder Clause's Historical Definition of Punishment.**

The burden imposed by the Act does not fall within the Bill of Attainder Clause's historical definition of punishment. Plaintiff's argument that "courts have struck down laws that infringe upon a person's employment" is misleading. Opp'n at 13. Courts have struck down as bills of attainder "legislative enactment[s] barring designated individuals or groups from participation in specified employments or vocations." *Nixon*, 433 U.S. at 474; *see, e.g.*, *United States v. Brown*, 381 U.S. 437 (1967) (prohibiting Communist Party members from serving as officers in labor unions); *United States v. Lovett*, 328 U.S. 303 (1946) (barring named individuals from government employment); *Cummings v. Missouri*, 71 U.S. 277 (1866) (prohibiting clergymen from ministry in the absence of a loyalty oath). But plaintiff cites no case in which courts have found a bill of attainder when a statute merely regulates a particular profession with respect to a particular aspect of employment (discipline), rather than forecloses an entire class of people from seeking employment altogether. And plaintiff's claim that "the Act is such a substantial and severe

infringement" on employment "that it is of the same quality as legislative punishments that have outright barred disfavored classes from employment or associational opportunities" is meritless. *See* Opp'n at 13. As discussed above, the burden imposed by Section 116 is minimal, and certainly not equivalent to the burden of being barred from employment altogether. The historical application of the bill of attainder clause shows that invoking it here to strike down Section 116 would be contrary to precedent.

### C. The Act's Legislative History Does Not Evince an Intent To Punish.

The legislative history of the Act is devoid of any evidence of intent to punish sworn law enforcement officers. Plaintiff offers only conclusory allegations—without citations to the record—that the Council "explicitly resolved to appease the citizens who were demanding retribution," or complaints that the Act was passed without "study or debate" or "data-supported evidence." Opp'n at 14. At bottom, plaintiff fails to identify anything in the legislative history of the Act that suggests the Council intended to punish sworn law enforcement officials by passing the Act, let alone the "unmistakable evidence of punitive intent" required to constitute a violation of the Bill of Attainder Clause of the Constitution. *See Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*, 468 U.S. 841, 855-56 n.15 (1984); *BellSouth Corp. v. FCC*, 144 F.3d 58, 67 (D.C. Cir. 1998) (finding no evidence of legislative punishment when plaintiff "provided no legislative history even touching on the purposes behind [the challenged provision], much less presenting 'smoking gun' evidence of congressional

vindictiveness"). Without such evidence, plaintiff cannot show that the Council passed the Act with punitive intent.

III. **Plaintiff's Contract Clause Claim Fails Because the Act Does Not Substantially Impair an Existing Contractual Obligation and It Is a Reasonable and Necessary Means of Improving Policy Accountability.**

A. **The Act Does Not Substantially Impair an Existing Contractual Obligation.**

Plaintiff cannot succeed on its Contract Clause claim because the Act does not affect an existing contract, and even if it did, plaintiff cannot show that the contract is substantially impaired by the Act. *See* Mot. at 28-32. In response, plaintiff argues that Article 12 of the soon-to-expire CBA should be construed to bind the District to its terms forever. Opp'n at 14-15. Plaintiff further argues that the Act substantially impairs the CBA because it will not allow the District to be indefinitely bound to the current Article 12. *Id.* at 18-20. Plaintiff is incorrect on both counts.

1. **The Act Does Not Impair an Existing Contractual Obligation.**

Claiming that the Act impairs an existing contractual obligation, plaintiff argues that the existing contractual rights in Article 12 should extend indefinitely based on the language that it "shall be incorporated into any successor [CBA]." *Id.* at 14-15. Plaintiff also cites cases stating that "[c]ourts interpret [CBAs] according to the general rules of contract law," *id.* at 16 (quoting *Holland v. Freeman United Coal Mining Co.*, 574 F. Supp. 2d 116, 129 (D.D.C. 2008)), and that "[w]here the language of a contract is clear and unambiguous on its face, a court will assume that the meaning ordinarily ascribed to those words reflects the intentions of the parties," *id.* (quoting *Mesa Air Grp., Inc. v. Dep't of Transp.*, 87 F.3d 498, 503 (D.C. Cir. 1996)).

14

However, neither of the cases plaintiff cites address a provision like the one at issue here, which is virtually identical to the one in *Local Division 589, Amalgamated Transit Union v. Massachusetts*, 666 F.2d 618 (1st Cir. 1981). *See* Mot. at 30-31. There, in an opinion by then-Judge Breyer, the court found that the procedural provision at issue should not be read literally as binding the parties indefinitely. *Id.* at 637-38. Although it is true that contracts are generally interpreted according to their plain language, it is also true that "[w]hen interpreting contractual provisions, 'the judicial task ... is to give effect to the mutual intent of the parties.'" *Holland*, 574 F. Supp. 2d at 129 (quoting *Mesa*, 87 F.3d at 503). And here, like in *Local Division 589*, the mutual intent of the Parties could not have been to "bind their successors forever." 666 F.2d at 638. The better interpretation is that the Parties intended for the provision to remain in place for a reasonable time after the CBA expires, in the event that the discipline would be a subject of the subsequent CBA (which is no longer the case). *Id.*[4] To conclude otherwise would mean that the parties not only intended to bind themselves indefinitely, but also that they intended, and have the power, to

---

[4]     Plaintiff argues in its opposition that the District conceded that the current Article 12 should remain in place for a reasonable time after the CBA expires. Opp'n at 18. The District made no such concession. Rather, the District argued that "[a] more reasonable interpretation of the current Article 12 was that it was "only a temporary gap-filler for the period between the expiration of the current CBA and the entry of a new agreement" and that even then this was "assuming that disciplinary procedures were to be a subject of the new agreement." Mot. at 29-30. Even assuming the District's argument were incorrect, at most this would mean that the current Article 12 would "only remain in effect for 'a reasonable time' after the current CBA expires," *id.* at 31 n.4, further assuming that the article's continued effectiveness for such time were the only way to uphold the Act against plaintiff's challenges (which it is not).

indefinitely bar the Council—the very body that imbued the parties with their bargaining rights under the CMPA—from prospectively legislating on matters of police discipline. As discussed below, Section III.A.2, parties generally cannot bar legislatures from making legislative modifications to statutes.

Plaintiff argues that *Local Division 589* is distinguishable because it would have kept "*the entire agreement* in place perpetually." Opp'n at 17-18 (emphasis in original). This is, at best, a distinction without a difference. In *Local Division 589*, the First Circuit was only concerned about the interest arbitration provision of the CBA, *see* 666 F. 2d at 638, so it was irrelevant to the court's analysis whether other provisions would remain in effect too.

In short, plaintiff offers no explanation for why Article 12 should be interpreted any differently than the arbitration provision in the CBA in *Local Division 589*. Under this interpretation, the Act does not apply to an existing contractual obligation because it only applies once the current CBA has expired. *See* Act, § 116, *available at* https://lims.dccouncil.us/Legislation/B23-0825 (last accessed September 22, 2020). Plaintiff's Contract Clause claim therefore fails. *See Washington Serv. Contractors Coal. v. District of Columbia*, 54 F.3d 811, 818 (D.C. Cir. 1995) (finding no Contract Clause violation when there was "no existing contractual relationship to be 'impaired'").

### 2.   Even if the Act Impairs an Existing Contractual Obligation, the Impairment Is Not Substantial.

Even if the Court were to interpret Article 12 as binding the Parties indefinitely, the Act still would not substantially impair the CBA. As the District

noted, *see* Mot. at 31, the court in *Local Division 589* found that even if the perpetual provision were interpreted as binding the parties indefinitely, the legislation at issue still did not substantially impair the CBA because, considering that the arbitration procedures were only a minor part of the CBA, taking them off the bargaining table would not deprive plaintiffs of the benefit they bargained for. 666 F. 2d at 638-41. Plaintiff does not even attempt to distinguish *Local Division 589* on this point.

As a general rule, absent a statutorily imposed contractual right, plaintiffs are not entitled to demand that governments freeze the law in place and refrain from making legislative modifications to statutes that could affect their existing contractual obligations. *Cf. Indiana ex rel. Anderson v. Brand*, 303 U.S. 95, 97, 102 n.14 (1938) (holding that one-year teacher contracts stating that the current terms of the state's Teachers' Tenure Law shall remain in effect for the duration of those contracts should bind the State perpetually because the Teachers' Tenure law itself, rather than the teacher contracts, created an indefinite contractual obligation). And as the District argued in its motion, such legislative modifications do not violate the Contract Clause. *See* Mot. at 28-29 (citing *Stone v. Mississippi*, 101 U.S. 814, 821 (1879); *Taylor v. City of Gadsden*, 767 F.3d 1124, 1135-36 (11th Cir. 2014); *Josic v. Josic*, 397 N.E.2d 204, 206 (Ill. App. Ct. 1979)).

Plaintiff does not argue that this is a case in which the Council has created a statutorily imposed contractual right that would prevent it from changing the CMPA. *See* Opp'n at 15 (arguing that "the Act here does not repeal or amend a statute in a manner that takes away *a statutory right relied upon by contractual parties*, but,

17

rather, specifically targets and nullifies the terms of Plaintiff's CBA itself.")
(emphasis added). Instead, plaintiff attempts to distinguish cases permitting
subsequent legislative modifications on the ground that they all involved existing
contracts. Opp'n at 15-16. But plaintiff misunderstands the District's point:
Plaintiff's Contract Clause claim could fail if there is no existing contract, *or* it could
fail if there is no substantial impairment. In this case, plaintiff's claim fails for both
reasons. Although, as plaintiff notes, there were existing contracts in *Stone*, *Josic* and
*Taylor*, the plaintiffs' Contract Clause claims still failed in each of those cases because
there was no constitutional impairment of any of those pre-existing contracts; the
pre-existing contracts were all subject to changes in the law. *See* Mot. at 29. And the
plaintiffs in those cases had not suffered a Contract Clause violation simply because
the government had changed the law. Similarly, plaintiff in this case has not suffered
a Contract Clause violation simply because the Council amended the CMPA.

Plaintiff also relies on *North Carolina Association of Educators, Inc. v. North
Carolina*, 786 S.E.2d 255 (N.C. 2016), in support of its substantial impairment theory.
In that case, a teachers union challenged the legislature's decision to revoke career
status for teachers who had already attained it. *Id.* at 257. The teachers union's
Contract Clause claim relied on the right to enforce individual teachers' contracts
with local school boards rather than a statutorily imposed contractual obligation. *Id.*
at 264. In finding that the legislature substantially impaired those contracts, the
court noted, "The record demonstrates the importance of those protections to the
parties and the teachers' reliance upon those benefits in deciding to take employment

as a public school teacher." *Id.* For example, the court pointed to evidence that "[t]eachers rely upon their career status rights in making employment decisions" and when interviewed and hired, "teachers frequently ask about career status rights." *Id.* Here, however, plaintiff has not argued that the Union's CBA protections affected its members' individual decisions to work for MPD. And it has not shown that it had any effect on the Union's decision to enter the soon-to-expire CBA with the District either.

Plaintiff alternatively argues that the Fourth and Ninth Circuits have respectively found cases involving changes to salary and delays in payment to be substantial impairments, so this should be a substantial impairment too. Opp'n at 19. But both cases cited by plaintiff involved effects on salary, which unlike disciplinary procedures, is one of the primary reasons that the party being paid will choose to enter a contract in the first place. *See Local Division 589*, 666 F. 2d at 640. Simply put, officers do not choose to join law enforcement based on the disciplinary procedures contained in their CBAs, as opposed to other factors, such as salary. *See id.* ("It is difficult to see how the promise that a particular arbitration procedure would be used indefinitely into the future—beyond the life of the express terms of the existing agreement—could have played more than a small role in an employee's decision to work for the MBTA."). Thus, plaintiff cannot show that the Act substantially impairs its CBA even if the current Article 12 were interpreted as binding the District forever. Thus, plaintiff's Contract Clause claim must fail.

**B.    The Act Is a Reasonable and Necessary Means of Enhancing Police Accountability.**

Even if plaintiff could show that the Act substantially impairs an existing contractual obligation, plaintiff's Contract Clause claim still fails because the Act is a reasonable and necessary means of promoting police accountability. *See* Mot. at 32-37; *see U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 22-23 (1977) ("As is customary in reviewing economic and social regulation … courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure."); *see also City of El Paso v. Simmons*, 379 U.S. 497, 508-09 (1965) (stating that the government has "the sovereign right to protect the general welfare of the people" and that courts "must respect the wide discretion on the part of the legislature in determining what is and is not necessary" toward that end) (internal quotation marks omitted). Plaintiff does not dispute this point.

In its opposition, plaintiff refers to the Supreme Court's decision in *U.S. Trust Co.* for the proposition that a statute is not reasonable and necessary when "the alleged reason for the statute 'was not a new development.'" Opp'n at 21 (quoting *U.S. Trust Co.*, 431 U.S. at 31). Plaintiff argues that, because use-of-force incidents involving police officers are not a new development either, the Act therefore must not be reasonable and necessary. *Id.* To be sure, police misconduct existed at the time the current CBA went into effect and is not an entirely "new development"; however, the broad national consensus on a need for reform, including enhanced police accountability, certainly is. And such need is precisely the sort of broad and general social problem that the Council has "wide latitude" to develop legislative solutions to

address. *See Classic Cab, Inc. v. District of Columbia*, 288 F. Supp. 3d 218, 228-29 (D.D.C. 2018). The Act easily falls within the bounds of the Council's wide latitude to enact police reform now that there is increased public awareness—both in the District and across the Nation—of the need to improve police accountability.

Plaintiff argues that *Classic Cab* is distinguishable because the purpose of the law at issue there was to modernize the taxicab industry to compete with rideshare services like Uber and Lyft, and '[t]he *only* way in which that purpose could be achieved was through the requirement that the District's taxicabs use the same technology employed by the private rideshare companies that were attracting riders who would have otherwise used ordinary taxicabs." Opp'n at 23 (emphasis in original). But the court in *Classic Cab* stated that governments are "given wide latitude in deeming any interference reasonable and necessary" and noted that legislation to address social and economic problems "regularly survive[s] Contract Clause challenge." 288 F. Supp. 3d at 228-29. If there were truly only one way that legislatures could choose to address social and economic problems, there would be no need for latitude (much less, "wide" latitude), and legislation addressing these problems would not regularly survive Contract Clause challenges.

Plaintiff also argues that the Act is not reasonable and necessary because the Council did not "articulate any objective facts, studies, or investigations indicating that the District was experiencing issues with police accountability because of existing procedures." Opp'n at 21-22. But the Council did not have to cite any such information (though widely available, *see* Mot. at 16 n.2); the means it chose to

advance the interest in police accountability is entitled to legislative deference. *See City of El Paso*, 379 U.S. at 508-09; *U.S. Trust Co.*, 431 U.S. at 22-23. Plaintiff further notes that the District officer who shot Mr. Terrence Sterling was fired under the current disciplinary procedures. Opp'n at 22. But even assuming that those procedures were adequate in this one instance, this does not render the Act unreasonable or unnecessary. It does not mean that there is no need for increased accountability, or that police accountability will never be an issue in the future.

Finally, plaintiff argues that the Act is not reasonable and necessary to promote police accountability because "there are numerous alternative means that could be utilized to achieve the purpose of police accountability." *Id.* For example, plaintiff points to expanding the membership of the Use of Force Review Board and extending the period to commence a disciplinary action against an officer from 90 days to 180 days in some circumstances. *Id.* But as plaintiff acknowledges, the District not only considered these alternatives, but actually enacted them as part of the Act. *Id.* If anything, the fact that these "alternative means" were enacted refutes plaintiff's argument that the increased police accountability was a pretext. And the fact that the Council enacted these alternative measures to improve accountability does not necessarily obviate the need to change the disciplinary procedures as well. The Council could have thought that all of these means taken together were necessary. The Council is entitled to deference on that point, and plaintiff fails to explain why the Court should not defer to the Council's determination.

IV.   **Plaintiff's Substantive Due Process Claim Fails Because Plaintiff Cannot Show that the Act Deprives It of a Valid Life, Liberty or Property Interest.**

The District's motion argued that plaintiff fails to state a substantive due proves claim because it does not articulate a deprivation of a protected property interest beyond a mere "indirect effect" on such interests. Mot. at 38-40. Plaintiff does not meaningfully dispute this point. Instead, plaintiff simply asserts that this case does not involve "the *types* of indirect adverse effects" that fall outside the scope of the Due Process Clause. Opp'n at 23 (emphasis added). Plaintiff cites no authority for its theory that *some* merely indirect effects on life, liberty or property interests can qualify as unconstitutional deprivations while others cannot. Indeed, this theory has no basis in law.

Plaintiff also argues that "the deprivation of Plaintiff's property rights is not merely incidental, but is explicit and intentional." Opp'n at 24. Once again, plaintiff cites no authority for this proposition. And plaintiff fails to explain how the District's intent is in any way relevant when plaintiff has failed to make even a threshold showing of a deprivation of a protected property interest.

Next, plaintiff attempts to distinguish *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 764 (2005), on the theory that "plaintiff does not argue that it has a right to the execution of discretionary procedures, but rather that Defendants have retroactively destroyed the vested contractual rights" that were "obtained through arduous, decades-long negotiations." Opp'n at 24. This is, at most, a distinction without a difference. As the District's motion noted, *Town of Castle Rock* holds that a plaintiff's alleged entitlement to a specific procedure is not a valid life, liberty or

23

property interest for purposes of a substantive due process claim. Mot. at 39. This remains true regardless of whether plaintiff has negotiated for this procedure as part of a contract. Similar to the plaintiff in *Town of Castle Rock*, plaintiff here cannot make a threshold showing of a protected property interest.

Finally, plaintiff asserts that it "merely seeks to prevent Defendants from upending the vested contractual rights that were obtained only through sacrifice of other rights in the bargaining process." Opp'n at 24. This is, at most, a claim of a right to a specific contractual provision, which, as noted above, and in the District's motion, *see* Mot. at 39, is not a valid life, liberty or property interest for purposes of a substantive due process claim. Because plaintiff cannot make even a threshold showing that the Act deprives it of a life, liberty or property interest, plaintiff's substantive due process claim cannot succeed.

## V.   Plaintiff's Home Rule Act Claims Fail Because They Are Duplicative of Plaintiff's Constitutional Claims.

Plaintiff's Home Rule Act claims should be dismissed as duplicative of its four constitutional claims. Mot. at 42. Indeed, plaintiff's entire argument for a Home Rule Act violation depends on the theory that the constitutional violations it has alleged "also constitute violations of the D.C. Home Rule Act." Pl.'s Mot. for Summ. J. [3] at 21. Nevertheless, plaintiff argues that its Home Rule Act claims "are not duplicative because the Home Rule Act is a distinct body of law applicable only in the District of Columbia that is co-extensive with the rights afforded under" the Constitution. Opp'n at 25. This statement fails to explain how those claims are not duplicative. Practically speaking, they entirely depend on plaintiff showing a constitutional violation under

at least one of its four theories, and plaintiff offers no explanation for how its Home Rule Act claims could succeed if its constitutional claims do not. Absent this showing, plaintiff's Home Rule Act claims should be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should grant the District's cross-motion to dismiss the Complaint or, in the alternative, for summary judgment.

Dated:  September 25, 2020.       Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Chief, Equity Section

*/s/ Pamela A. Disney*
PAMELA A. DISNEY [1601225]
GAVIN N. PALMER [1619264]
Assistant Attorneys General
400 Sixth Street, N.W., Suite 10100
Washington, D.C. 20001
(202) 807-0371
pamela.disney@dc.gov

*Counsel for Defendants*